[Civ. No. 11685. Third Dist. June 12, 1968.]

SACRAMENTO NEWSPAPER GUILD, LOCAL 92 of THE AMERICAN NEWSPAPER GUILD, AFL-CIO, et al., Plaintiffs and Respondents, v. SACRAMENTO COUNTY BOARD OF SUPERVISORS et al., Defendants and Appellants.

John B. Heinrich, County Counsel, for Defendants and Appellants.

Harold W. Kennedy and John D. Maharg, County Counsel (Los Angeles), and Clarence H. Langstaff, Assistant County Counsel, as Amici Curiae on behalf of Defendants and Appellants.

William P. Smith, Jr., and Richard A. Case for Plaintiffs and Respondents.

Flint & MacKay, Edward L. Compton and Lon R. Clearwaters as Amici Curiae on behalf of Plaintiffs and Respondents.

FRIEDMAN, J.—At the behest of plaintiff Newspaper Guild the trial court issued a preliminary injunction restraining the Sacramento County board of supervisors and its committees from holding any closed meeting at which three or more members were present except under the statutory exceptions for personnel and national security matters. The lawsuit was premised upon asserted violations of California's public meeting law, known as the Brown Act. (Gov. Code, §§ 54950-54960.[1]) The board of supervisors and its members appeal from the order granting the preliminary injunction.

[1] In this opinion statutory references will be to the Government Code unless otherwise indicated.

Immediate occasion for the lawsuit was a luncheon gathering at the Elks Club in Sacramento on February 8, 1967. Participants were the five county supervisors, the county counsel, county executive, county director of welfare and several members of the Central Labor Council, AFL-CIO. The subject of discussion was a strike of the Social Workers Union against the county and the county's effort to enforce an injunction secured in connection with the strike. Newspaper reporters sought but were denied admission to the gathering. In their amended complaint the plaintiffs described not only the February 8 occurrence but alleged threatened future meetings of the supervisors, the county counsel and county executive with third persons selected by them.

Pending the appeal this court issued a limited writ of supersedeas permitting the supervisors to confer with the county counsel under conditions in which the lawyer-client privilege would obtain, but otherwise maintaining enforceability of the trial court decree (*Sacramento Newspaper Guild* v. *Sacramento County Board of Supervisors,* 255 Cal.App.2d 51 [62 Cal.Rptr. 819].)

The Brown Act opens with section 54950, which states the law's intent that the "actions [of local legislative bodies] be taken openly and that their deliberations be conducted openly."[2] At its core is section 54953, which declares: "All meetings of the legislative body of a local agency shall be open and public. . . ." Both these declarations were in the original version of the Brown Act adopted in 1953. As the legislative body of a local agency, a county board of supervisors is subject to the act. (§§ 54951, 54952.) One feature of the act is section 54957, which permits executive sessions to consider (a) matters affecting the national security and (b) employment and dismissal of personnel. The 1961 Legislature made several additions to the Brown Act (Stats. 1961, ch.

---

[2]The full text of section 54950 declares:

"In enacting this chapter, the Legislature finds and declares that the public commissions, boards and councils and the other public agencies in this State exist to aid in the conduct of the people's business. It is the intent of the law that their actions be taken openly and that their deliberations be conducted openly.

"The people of this State do not yield their sovereignty to the agencies which serve them. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments they have created."

1671), among them a definition of the phrase "action taken" in section 54952.6 and a new misdemeanor penalty provision in section 54959. [3]

A provision of the Brown Act, section 54960, authorizes any "interested person" to seek legal restraint against violations or threatened violations. Defendants do not question the Newspaper Guild's standing to sue. The complaint alleges that the Newspaper Guild is a labor organization composed of professional working newspaper men and women. Whether that allegation makes out adequate standing to sue is at least questionable. (See *United States* ex rel. *Stowell* v. *Deming* (1927) 19 F.2d 697, 698, cert. den. 275 U.S. 531 [72 L.Ed. 410, 48 S.Ct. 28] ; *Adler* v. *City Council of Culver City* (1960) 184 Cal.App.2d 763, 775 [7 Cal.Rptr. 805] ; *Associated Boat Industries* v. *Marshall* (1951) 104 Cal.App.2d 21, 22 [230 P.2d 379].) The right to disclosure is an attribute of citizenship, not possessed in any increased degree by persons or groups whose interest in access to news is economic. (See *Oxnard Publishing Co.* v. *Superior Court* (1968) *(Cal. App.) [68 Cal.Rptr. 83].) Section 54950's broad declaration of the public's right to disclosure should logically extend standing to any county elector. Had the county raised the issue in the trial court, amendment of the complaint to add appropriate parties and allegations would have been little more than a matter of mechanics. Under the circumstances, there is substantial compliance with section 54960.

Although all five of the county supervisors were present at the Elks Club luncheon of February 8, 1967, and although the subject of discussion was a matter of county governmental interest, defendants contend that the trial court erred in viewing it as a meeting within the scope of the Brown Act. They rely upon *Adler* v. *City Council of Culver City, supra,* 184 Cal.App.2d at pp. 770-774, which held the statute applicable only to formal meetings for the transaction

---

[3]Section 54952.6 states: "As used in this chapter, 'action taken' means a collective decision made by a majority of the members of a legislative body, a collective commitment or promise by a majority of the members of a legislative body to make a positive or a negative decision, or an actual vote by a majority of the members of a legislative body when sitting as a body or entity, upon a motion, proposal, resolution, order or ordinance."

Section 54959 provides: "Each member of a legislative body who attends a meeting of such legislative body where action is taken in violation of any provision of this chapter, with knowledge of the fact that the meeting is in violation thereof, is guilty of a misdemeanor."

*A hearing was granted by the Supreme Court on June 19, 1968.

of official business, inapplicable to informal sessions. The Newspaper Guild, on the other hand, argues that the 1961 amendments of the Brown Act were designed to nullify the *Adler* decision. (See 42 Ops. Cal. Atty. Gen. 61 (1963) ; Comment, *Access to Governmental Information in California*, 54 Cal.L.Rev. 1650, 1653-1655 (1966) ; cf. Herlick, *California's Secret Meeting Law*, 37 State Bar J. 540 (1962).

Section 54953 is unequivocal in its central thrust upon official sessions for the transaction of official business, but somewhat ambiguous as it encounters peripheral gatherings or conversations among board members where public business is a topic. Interpretation to accomplish legislative intent is a truism of the law. Instead of appraising the accuracy of Adler as an interpretation of the pre-1961 law and analyzing the 1961 amendments so far as they bear upon Adler, we prefer to interpret the public meeting provision by examining the current enactment of which it forms a part. Attempts to define "meeting" by synonyms or by coupling it with modifying adjectives involve a degree of question-begging. Interpretation requires inquiry into the Brown Act's objective and into the functional character of the gatherings or sessions to which the legislature intended it to apply.

There is nothing in the Brown Act to demarcate a narrower application than the range of governmental functions performed by the agency. Although the Brown Act artificially classifies it as a legislative body, a board of supervisors actually performs legislative, executive and even quasi-judicial functions. (*Chinn* v. *Superior Court* (1909) 156 Cal. 478, 481 [105 P. 580] ; *Fraser* v. *Alexander* (1888) 75 Cal. 147, 152 [16 P. 757].) Section 54950 is a deliberate and palpable expression of the act's intended impact. It declares the law's intent that deliberation as well as action occur openly and publicly. Recognition of deliberation and action as dual components of the collective decision-making process brings awareness that the meeting concept cannot be split off and confined to one component only, but rather comprehends both and either. To "deliberate" is to examine, weigh and reflect upon the reasons for or against the choice. (See Webster's New International Dictionary (3d ed.)) Public choices are shaped by reasons of fact, reasons of policy or both. Any of the agency's functions may include or depend upon the ascertainment of facts. (*Walker* v. *County of Los Angeles* (1961) 55 Cal.2d 626, 635 [12 Cal.Rptr. 671, 361 P.2d 247].) Deliberation

thus connotes not only collective discussion, but the collective acquisition and exchange of facts preliminary to the ultimate decision.

The act supplies additional internal evidence that deliberative gatherings are "meetings," however confined to investigation and discussion. Section 54952.6 defines the phrase "action taken." (Fn. 3, *supra*.) This definition leads to two other provisions where this phrase, or an approximation of it, appears: the declaration of legislative intent in section 54950 and the misdemeanor declaration in section 54959 (fns. 2 and 3, *supra*). In section 54950 the notion of action-taking is juxtaposed to that of deliberation, indicating that deliberation and action, however they may coalesce, are functionally discernible steps, both of which must be taken in public view. The misdemeanor penalty in section 54959, in contrast, is limited to a meeting "where action is taken." Critics of open meeting laws have been troubled by the prospect of criminal prosecutions against public officials who make the wrong guess when confronted with an ambiguous situation. (See Comment, *Open Meeting Legislation*, 75 Harv.L.Rev. 1199, 1211 (1962); Comment, 54 Cal.L.Rev. *supra*, at p. 1662.) Apparently sharing this concern, the Legislature has made the criminal sanction narrower than the law's declaration of intended coverage. Not every violation of the Brown Act is a violation of section 54959. The misdemeanor penalty is focused on the meeting where action is taken, not on the meeting confined to deliberation. The narrow, carefully designed criminal penalty evidences the act's broader scope when no crime is involved, that is, when deliberation is unaccompanied by "action taken."

Section 54952 defines the "legislative body" of a local agency to include its committees.[4] Boards of supervisors have investigatory powers which they may delegate to committees,

---

[4]Specifically, section 54952 provides: "As used in this chapter, 'legislative body' means the governing board, commission, directors or body of a local agency, or any board or commission thereof, and shall include any board, commission, committee, or other body on which officers of a local agency serve in their official capacity as members and which is supported in whole or in part by funds provided by such agency, whether such board, commission, committee, or other body is organized and operated by such local agency or by a private corporation." The trial court limited the injunction to board and committee meetings of three or more members. At this point the injunction parallels an opinion of the Attorney General holding the public meeting requirement inapplicable to those committees composed of less than a quorum of the parent body (32 Ops. Cal. Atty. Gen. 240). That phase of the injunction is not in dispute.

which in turn may "send for persons and papers." (Gov. Code, §§ 25170-25171.) Without troubling the lexicographers, one recognizes a committee as a subordinate body charged with investigating, considering and reporting to the parent body upon a particular subject. Normally, committees investigate, consider and report, leaving the parent body to act. By the specific inclusion of committees and their meetings, the Brown Act demonstrates its general application to collective investigatory and consideration activity stopping short of official action.[5]

Extrinsic as well as intrinsic evidence of legislative intent impels rejection of a narrow interpretation. Tendencies toward secrecy in public affairs have been the subject of extensive criticism and comment. Such governmental phenomena as "managed" news, secret meetings and closed records are disparaged as inimical to the goals and needs of a self-governing nation.[6] The suppression of public information at the local government level in California was the subject of investigation by an Assembly Interim Committee on Judiciary, which submitted its report at the 1953 legislative session. (Progress Report to the Legislature, Assembly Interim Com. on Judiciary (1953) Reg. Sess.) pp. 13-62.) The committee's recommendations included the proposed measure which later became the Brown Act. The report noted widespread evasion of existing open meeting statutes[7] through unannounced "sneak" meetings and through indulgence in

[5] In section 54955 the Brown Act provides for notice of adjourned or continued meetings. Section 54955.1, added in 1965, provides for the continuation of "hearings" in the same manner as continuation of "meetings." This segmented terminology supplies a foothold for the argument that a hearing is not a meeting, thus is unaffected by the public meeting demand of section 54953. Instead of signifying exclusion, section 54955.1 points to the inclusion of meetings and hearings within a single concept, since it assures public notice and awareness of both.

[6] See, for example, James Russell Wiggins, Freedom of Secrecy (1964 rev. ed.); Harold L. Cross, The People's Right to Know (1953) (Columbia Univ. Press); Lectures on Communications Media (1954) Univ. of Mich. Law School; Pickerell and Feder, Open Public Meetings of Legislative Bodies—California's Brown Act (1957) Legislative Problems, No. 7, Bureau of Public Administration, Univ. of Calif.; The Right to Know, 12 Assembly Interim Com. Report No. 10, Government Organization (1965) California Legislature; Comment, *Access to Governmental Information*, 54 Cal.L.Rev. 1650 (1966); Comment, *Open Meeting Legislation*, 75 Harv.L.Rev. 1199 (1962); Parks, *Applying the Right to Know Under the Constitution*, 26 Geo.Wash.L.Rev. 1 (1957).

[7] See Government Code section 25080, governing county boards of supervisors, section 36808, relating to city councils of general law cities, and

euphemisms such as executive session, conference, caucus, study or work session, and meeting of the committee of the whole. (*Ibid.*, pp. 21-23.) The report declared: "It is now apparent to this committee that there is a real need for legislative action. Legislative and administrative groups and officials through devious ways are depriving us, the public, of our inalienable right to be present and to be heard at all deliberations of governmental bodies wherein decisions affecting the public are being made." (*Ibid.*, p. 21.) In presenting and recommending the measure later known as the Brown Act, the committee stated: "The committee is of the opinion that there is a genuine and compelling need for legislative action of a nature designed to curb this misuse of democratic process by public bodies who would legislate in secret. Unless for proper security reasons, the public has the right to be present and to be heard during all phases of legislative enactment by any governmental agency. This right is a source of strength to our Country and must be protected at all costs." (*Ibid.*, p. 61.)

In this area of regulation, as well as others, a statute may push beyond debatable limits in order to block evasive techniques. An informal conference or caucus permits crystallization of secret decisions to a point just short of ceremonial acceptance. There is rarely any purpose to a nonpublic premeeting conference except to conduct some part of the decisional process behind closed doors. Only by embracing the collective inquiry and discussion stages, as well as the ultimate step of official action, can an open meeting regulation frustrate these evasive devices.[8] As operative criteria, formality and informality are alien to the law's design, exposing it

---

Education Code section 966, relating to school boards, all having statutory predecessors which antedated the Brown Act and all requiring meetings to be public.

[8]Members of public boards bring to bear upon their ultimate decisions a range of impressions, experiences and beliefs, some gained individually, others collectively. The writer of the comment in 54 California Law Review 1650, 1651, observes: "There is a spectrum of gatherings of agency members that can be called a meeting, ranging from formal convocations to transact business to chance encounters where business is discussed. However, neither of these two extremes is an acceptable definition of the statutory word 'meeting.' Requiring all discussion between members to be open and public would preclude normal living and working by officials. On the other hand, permitting secrecy unless there is formal convocation of a body invites evasion." Although one might hypothesize quasi-social occasions whose characterization as a meeting would be debatable, the difference between a social occasion and one arranged for pursuit of the public's business will usually be quite apparent.

to the very evasions it was designed to prevent. Construed in the light of the Brown Act's objectives, the term "meeting" extends to informal sessions or conferences of the board members designed for the discussion of public business. ■ The Elks Club luncheon, attended by the Sacramento County Board of Supervisors, was such a meeting.

■ Defendants, nevertheless, contend that the occasion was a lawful exercise of the lawyer-client privilege existing between the supervisors and the county counsel, as their attorney; that the pending lawsuit to restrain striking and picketing by county-employed social workers furnished the occasion for exercise of the privilege.[9] Defendants point out that the former law denied the privilege where persons other than the attorney and client were present; that section 952 of the new Evidence Code now extends the privilege to limited situations involving the presence of third persons.[10]

■ Evidence Code section 952 confers the privilege upon information communicated "in confidence" to the lawyer and upon advice given by the lawyer. The privilege cannot be invoked where the client's communication was not intended to be confidential. (*City & County of San Francisco* v. *Superior Court* (1951) 37 Cal.2d 227, 234-235 [231 P.2d 26].)

■ Participants in the Elks Club luncheon testified at the preliminary injunction hearing. In substance they said that the luncheon took place because the labor representatives wanted to discuss the social workers' strike and to ascertain whether a strike sanction by the central labor council would involve that body in the lawsuit. One supervisor testified that he had attended as a guest of the central labor council, but had no knowledge of the discussion topic until he arrived. Another supervisor testified that he had attended to ascertain the attitude of the central labor council regarding the strike litigation. A third supervisor filed an affidavit. None of these

---

[9]The injunction suit is described in some detail in *In re Berry* (1968) 68 Cal.2d 137 [65 Cal.Rptr. 273, 436 P.2d 273].

[10]Section 952 of the Evidence Code provides: "As used in this article, 'confidential communication between client and lawyer' means information transmitted between a client and his lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted, and includes advice given by the lawyer in the course of that relationship."

supervisors stated that he or any other supervisor had said anything to the county counsel in confidence. None claimed attendance for the purpose of getting the county counsel's legal advice and none claimed receiving any. If any communication passed between the supervisors and their attorney at the Elks Club luncheon, the record fails to reveal it.

. Where the privilege against disclosure is claimed, its opponent has the burden of proving nonconfidentiality. (Evid. Code, § 917.) Here, although a courtroom occasion occurred, the privilege agaist testifying was not claimed.[11] The assertion appears belatedly, in the form of argument urging a legal characterization. There is no evidentiary basis at all for the characterization. The luncheon meeting of February 8, 1967, finds no shelter under the lawyer-client privilege. The trial court correctly concluded that it violated section 54953.

 Aside from the statutory exceptions for national security and personnel matters, the preliminary injunction prohibits nonpublic meetings of three or more supervisors "for whatever purpose." Defendants object to the breadth of the injunction, asserting that the Brown Act should not be construed to prevent conferences between the supervisors and the county counsel for the purpose of seeking and receiving confidential legal advice. Defendants rely upon an opinion of the Attorney General, 36 Ops. Cal. Atty. Gen. 175 (1960), holding that in narrowly limited situations, where a public discussion of legal problems would benefit the agency's adversary and injure the public interest, the board members may meet privately with their attorney. Defendants' position is supported by a brief filed by the County Counsel of Los Angeles County as amicus curiae.

The Brown Act, specifically section 54953, broadly encompasses "all meetings." Viewed as a statutory microcosm, its demand is forthright, offering no internal interstice for private lawyer-client consultations. It is not a microcosm, however, but one element in a structure of constitutional and statutory policies covering the powers, duties and procedures of local agencies of government. Another part of this legal structure is the privilege attaching to confidential lawyer-client communications. This privilege was for almost a cen-

---

. [11]At the preliminary injunction hearing the supervisors claimed the privilege for official information where disclosure would injure the public interest (Evid. Code, § 1040), but not the attorney-client privilege. The claim was overruled by the trial judge. The ruling is not assailed on appeal.

tury expressed in Code of Civil Procedure section 1881, subdivision 2, and has now been recodified in the Evidence Code. ■ California decisional law assumes without discussion that the privilege is just as available to public agency clients and their lawyers as to their private counterparts. (*Holm* v. *Superior Court* (1954) 42 Cal.2d 500, 506-508 [267 P.2d 1025, 268 P.2d 722]; *Jessup* v. *Superior Court* (1957) 151 Cal.App.2d 102, 108-111 [311 P.2d 177].) Codifying this notion, the Evidence Code distinctly includes public agencies and entities among the clients who may assert the privilege.[12]

Traditionally the district attorney has served both as public prosecutor and as civil attorney for California counties and their officials. He fulfills this dual role in those counties which have not established separate civil law offices. (§§ 26520-26528.) When the office of county counsel is established by charter or by act of the supervisors under state law, that officer usually assumes the civil law functions as attorney for the county and its board of supervisors. (§§ 26529, 27640-27645.) Subject to charter restrictions, supervisors may also employ special counsel to furnish representation and advice in civil legal matters. (§§ 25203, 31001.)

Plaintiffs do not dispute the availability of the lawyer-client privilege to public officials and their attorneys. They view it as a barrier to testimonial compulsion, not a procedural rule for the conduct of public affairs. The view is too narrow. ■ The privilege against disclosure is essentially a means for achieving a policy objective of the law. The objective is to enhance the value which society places upon legal representation by assuring the client full disclosure to the attorney unfettered by fear that others will be informed. (*Greyhound Corp.* v. *Superior Court* (1961) 56 Cal.2d 355,

[12]Evidence Code section 951: "As used in this article, 'client' means a person who, directly or through an authorized representative, consults a lawyer for the purpose of retaining the lawyer or securing legal service or advice from him in his professional capacity, and includes an incompentent (a) who himself so consults the lawyer or (b) whose guardian or conservator so consults the lawyer in behalf of the incompetent."

Evidence Code section 175: " 'Person' includes a natural person, firm, association, organization, partnership, business trust, corporation, or public entity."

Evidence Code section 200: " 'Public entity'. includes a nation, state, county, city and county, city, district, public authority, public agency, or any other political subdivision or public corporation, whether foreign or domestic."

See Law Revision Commission Comment following Evidence Code section 951; also, 6 Cal. Law Revision Com. Rep. p. 221.

396 [15 Cal.Rptr. 90, 364 P.2d 266]; *Holm* v. *Superior Court, supra,* 42 Cal.2d at pp. 506-507; 8 Wigmore on Evidence (McNaughton rev. 1961) § 2291; Comment, *Attorney-Client Privilege in California,* 10 Stan.L.Rev. 297-300 (1958); Louisell, *Confidentiality, Conformity and Confusion : Privileges in Federal Court Today,* 31 Tulane L. Rev. 101 (1956).) The privilege serves a policy assuring private consultation. If client and counsel must confer in public view and hearing, both privilege and policy are stripped of value. Considered in isolation from the Brown Act, this assurance is available to governmental as well as private clients and their attorneys.

Thus the structure of laws governing local public boards includes two separate substructures, one in the Government Code demanding open meetings, the other in the Evidence Code assuring confidential lawyer-client conferences. Each expresses a separate policy objective, but neither refers expressly to the other in terms of dominance or reconciliation. At this point we assume without deciding that the Evidence Code, enacted in 1965, merely recodified and continued the existing statutory, lawyer-client privilege of public agencies; that the Brown Act, adopted in 1953, is really the later of the two statutes.

■ When a later statute supersedes or substantially modifies an earlier law but without expressly referring to it, the earlier law is repealed or partially repealed by implication. ■ ■ The courts assume that in enacting a statute the Legislature was aware of existing, related laws and intended to maintain a consistent body of statutes. (*Stafford* v. *Realty Bond Service Corp.* (1952) 39 Cal.2d 797, 805 [249 P.2d 241]; *Lambert* v. *Conrad* (1960) 185 Cal.App.2d 85, 93 [8 Cal.Rptr. 56]; 1 Sutherland, Statutory Construction (3d ed.) § 2012, pp. 461-466.) Thus there is a presumption against repeals by implication; they will occur only where the two acts are so inconsistent that there is no possibility of concurrent operation, or where the later provision gives undebatable evidence of an intent to supersede the earlier; the courts are bound to maintain the integrity of both statutes if they may stand together. (*Warne* v. *Harkness* (1963) 60 Cal.2d 579, 588 [35 Cal.Rptr. 601, 387 P.2d 377]; *Penziner* v. *West American Finance Co.* (1937) 10 Cal.2d 160, 176 [74 P.2d 252]; *Smith* v. *Mathews* (1909) 155 Cal. 752, 758 [103 P. 199]; see *Williams* v. *Los Angeles Metropolitan Transit Authority* (1968) 68 Cal.2d 599, 603 [68 Cal.Rptr. 297, 440 P.2d 497].)

Also relevant when the seeming inconsistencies appear in' separate codes is the rule declaring that the codes blend into each other and constitute a single statute for the purposes of statutory construction. (*Pesce* v. *Department of Alcoholic Beverage Control* (1958) 51 Cal.2d 310, 312 [333 P.2d 15]; *People* v. *Vassar* (1962) 207 Cal.App.2d 318, 322 [24 Cal.Rptr. 481].)

One of the provisions of the Brown Act, section 54958, declares its application to local legislative bodies "notwithstanding the conflicting provisions of any other state law." Failing to designate what if any laws are superseded, such a clause has no greater force than a repeal by implication; it subordinates or repeals existing law only to the extent that the two laws are irreconcilable. (*Penziner* v. *West American Finance Co., supra,* 10 Cal.2d at pp. 174-175; 45 Cal.Jur. 2d, Statutes, § 69, p. 590; 1 Sutherland, *op. cit.,* § 2013, pp. 466-468.)

The question, then, is whether the public meeting requirement of section 54953 abrogates by implication the statutory policy assuring opportunity for private legal consultation by public agency clients; or, in equivalent terms, whether the Brown Act supplies unmistakable evidence of a legislative intent to abolish that statutory policy. That policy is just as meaningful, as financially important, to public as to private clients. Public agencies are constantly embroiled in contract and eminent domain litigation and, with the expansion of public tort liability, in personal injury and property damage suits. Large-scale public services and projects expose public entities to potential tort liabilities dwarfing those of most private clients. Money actions by and against the public are as contentious as those involving private litigants. The most casual and naive observer can sense the financial stakes wrapped up in the conventionalities of a condemnation trial. Government should have no advantage in legal strife; neither should it be a second-class citizen. We reiterate what we stated in the supersedeas aspect of this suit, *Sacramento Newspaper Guild* v. *Sacramento County Board of Supervisors, supra,* 255 Cal.App.2d at page 54: "Public agencies face the same hard realities as other civil litigants. An attorney who cannot confer with his client outside his opponent's presence may be under insurmountable handicaps. A panoply of constitutional, statutory, administrative and fiscal arrangements covering state and local government expresses a policy

that litigating public agencies strive with their legal adversaries on fairly even terms. We need not pause for citations to demonstrate the obvious. There is a public entitlement to the effective aid of legal counsel in civil litigation. Effective aid is impossible if opportunity for confidential legal advice is banned.''

Settlement and avoidance of litigation are particularly sensitive activities, whose conduct would be grossly confounded, often made impossible, by undiscriminating insistence on open lawyer-client conferences. In settlement advice, the attorney's professional task is to provide his client a frank appraisal of strength and weakness, gains and risks, hopes and fears. If the public's ''right to know'' compelled admission of an audience, the ringside seats would be occupied by the government's adversary, delighted to capitalize on every revelation of weakness.[13] A lawyer worth his salt would feel a *sense of treachery* in disclosing that kind of appraisal. (8 Wigmore *op. cit.* § 2291, p. 553.) To him its conduct in public would be shocking, unprofessional, unthinkable. He would prefer to fight the lawsuit to its bitter end. Frustration would blunt the law's policy in favor of settlement, and financial imprudence might be a compelled path.

As ex-lawyers, judges have been exposed to conditioning experiences which might induce inflation of the privilege's value. Actually it poses competing values. Professor Wigmore has observed that its benefits are indirect and speculative; that, as a testimonial privilege, it is worth preserving but is nevertheless an obstacle to the investigation of the truth.[14] In counterthrust to the values expressed in the ''right to know'' slogan, it permits an undeniable quantum of secrecy and, in overreaching hands, a potential tool of evasion. Implicit in its

[13]That the public's adversary in litigation may wrap himself in the banner of the public's right to know is illustrated by the following observation in *Jessup* v. *Superior Court, supra,* 151 Cal.App.2d at pages 107-108: ''Here Sanders is not desirous of seeing these reports as a citizen primarily interested in protection of the public; he is desirous of seeing them in the hope that he may gain some advantage therefrom in his contemplated suit against the city, making disclosure a possible disadvantage to the city. Thus the public welfare requires that inspection be postponed until disclosure will no longer be of disadvantage to the city.''

[14]8 Wigmore, *op. cit.,* § 2291, p. 554; see *Jencks* v. *United States* (1957) 353 U.S. 657, 670-672 [1 L.Ed.2d 1103, 1113-1114, 77 S.Ct. 1007]; *Carrow, Governmental Nondisclosure in Judicial Proceedings,* 107 U.Pa. L.Rev. 166 (1958); Timbers and Cohen, *Demands of Litigants for Government Information,* 18 U. Pittsburgh L.Rev. 687 (1957).

abrogation by implication is the assumption that the California Legislature indulged in a knowing choice between these competing public interests; that it adopted the Brown Act with unmistakable intent to abolish the values inherent in the lawyer-client privilege of local boards of government.

Evidence of such intent is by far too thin. It consists of the open meeting requirement of section 54953 and the declaration of legislative policy in section 54950 (fn. 2, *supra*). In requiring board members to deliberate and act in public, these do not inexorably embrace the board members in their roles as clients calling upon their attorney for legal advice. In declaring the public's right to be informed, they do not necessarily propel the public's legal adversary into the lawyer-client conference clad in the robes of good citizenship. In recommending the bill which became the Brown Act, the Assembly Interim Committee on Judiciary gave no clue that it had even considered the statutory lawyer-client privilege of public boards. Indeed, the committee professed no attempt to cope with the entire gamut of disclosure problems in local government.[15]

Parallel to the lawyer-client privilege is that of a public officer to refuse disclosure of communications made to him in official confidence when "[d]isclosure of the information is against the public interest. . . ." (Evid. Code, § 1040, subd. (a)(b)(2), replacing former Code Civ. Proc., § 1881, subd. 5; see *Jessup* v. *Superior Court*, *supra*, 151 Cal.App.2d at pp. 107-108.) The interim committee voiced no criticism of the latter privilege, although it too is a possible tool of official secrecy. Neither the Brown Act nor its history supplies undebatable evidence of a legislative intent to supersede the assurance of private legal consultation stemming from the statutory lawyer-client privilege.

At various legislative sessions after 1953 bills were introduced, but not passed, expressly amending the Brown Act to permit board members and their attorneys to confer on property acquisition or pending litigation. A recommendation to the same general effect was made by an interim committee

---

[15]Referring to the bill it was recommending, the committee stated: "While such a measure would not provide an answer to all the needs of legislation aimed at cleansing this evil of suppression of public information by public bodies, from our government, it is felt it will effectively plug the most apparent loopholes in the existing laws as they now relate to meetings at which legislative action may be taken." (Progress Report to the Legislature, 1953 Reg. Sess., by Assembly Interim Com. on Judiciary, p. 61.)

in 1965. (The Right to Know, 12 Assembly Interim Com. Report No. 10, Governmental Organization (1965), California Legislature, pp. 41-44.) The record and briefs point to the failure of these proposals as alleged evidence of the 1953 Legislature's design to abrogate the public lawyer-client privilege. The unpassed bills of later legislative sessions evoke conflicting inferences. Some legislators might propose them to replace an existing prohibition; others to clarify an existing permission. A third group of legislators might oppose them to preserve an existing prohibition, and a fourth because there was no need to clarify an existing permission. The light shed by such unadopted proposals is too dim to pierce statutory obscurities. As evidences of legislative intent they have little value. (See *Ambrose* v. *Cranston* (1968) 261 Cal.App.2d 137, 143-144 [68 Cal.Rptr. 22]; Willard and MacDonald, *The Effect of An Unsuccessful Attempt to Amend a Statute,* 44 Cornell L. Q. 336 (1958).)

The two enactments are capable of concurrent operation if the lawyer-client privilege is not overblown beyond its true dimensions. As a barrier to testimonial disclosure, the privilege tends to suppress relevant facts, hence is strictly construed. (*Greyhound Corp.* v. *Superior Court, supra,* 56 Cal.2d at p. 396.) As a barrier against public access to public affairs, it has precisely the same suppressing effect, hence here too must be strictly construed. As noted earlier, the assurance of private legal consultation is restricted to communications "in confidence." Private clients, relatively free of regulation, may set relatively wide limits on confidentiality. Public board members, sworn to uphold the law, may not arbitrarily or unnecessarily inflate confidentiality for the purpose of deflating the spread of the public meeting law. Neither the attorney's presence nor the happenstance of some kind of lawsuit may serve as the pretext for secret consultations whose revelation will not injure the public interest. To attempt a generalization embracing the occasions for genuine confidentiality would be rash. The Evidence Code lawyer-client provisions may operate concurrently with the Brown Act, neither superseding the other by implication.

Because the Brown Act did not abolish the statutory opportunity of boards of supervisors to confer privately with their attorney on occasions properly requiring confidentiality, the preliminary injunction is too broad. The preliminary injunction is modified by adding at its end a new paragraph 6, to read as follows:

"6. This preliminary injunction shall not prevent the Sacramento County Board of Supervisors from consulting privately with the county counsel or other attorney representing the board under circumstances in which the lawyer-client privilege conferred by sections 950 through 962 of the California Evidence Code may lawfully be claimed."

As so modified, the preliminary injunction order is affirmed. Each party is to bear its own costs on appeal.

Pierce, P. J., and Regan, J., concurred.