HUI MALAMA AINA O KO'OLAU, Plaintiff-Appellant, Cross-Appellee, *v.* RUDY PACARRO, in his capacity as Chairman of the City Council of the City and County of Honolulu, THE CITY COUNCIL OF THE CITY AND COUNTY OF HONOLULU, and JOHN A. CHANIN, in his capacity as Receiver in Bankruptcy for Land Research & Investment Co., Inc., and Related Entities, Defendants-Appellees

NO. 8673

(CIVIL NO. 67781)

JUNE 24, 1983

BURNS, C.J., TANAKA, J., AND CIRCUIT JUDGE GREIG IN PLACE OF ASSOCIATE JUDGE HEEN, RECUSED

OPINION OF THE COURT BY BURNS, C.J.

In this land use case, plaintiff Hui Malama Aina O Koʻolau ("Hui") and defendant John A. Chanin ("Chanin") as receiver in bankruptcy for Land Research & Investment Co., Inc., and its related entities (herein collectively referred to as "LRI"),[1] each appeal from the partial summary judgment in favor of the other. We affirm the partial summary judgment in favor of Chanin, reverse the partial summary judgment in favor of Hui, and remand for entry of complete summary judgment in favor of Chanin.

Hui is a community organization which seeks to prevent the urbanization of the rural, predominantly agricultural areas on the windward (east) coast of Oahu. The genesis of this case is Hui's complaint for declaratory judgment and an injunction halting the proposed development by LRI of a 164-unit townhouse project in Kaalaea known as Pulama Gardens.

Pulama Gardens is a planned development approved by the Honolulu City Council ("Council") in ordinance no. 4484 on July 21, 1975. The center of the present controversy is paragraph 17 of ordinance no. 4484 which states:

---

[1] In addition to Land Research & Investment Co., Inc., the related entities are:
1) LR&I Development Co., Inc., also known as "Devco," a wholly-owned subsidiary of Land Research & Investment Co., Inc.;
2) LR&I Development One, a limited partnership;
3) LR&I Development Two, a limited parnership; and
4) LR&I Development Four, a limited partnership.
Devco was the general managing partner for LR&I Development One, Two, and Four.

### 17. *Time Limit*

Failure to secure building permits, in accordance with the applicant's proposed construction phasing on file at the Department of Land Utilization, within one year of adoption may constitute grounds for City Council to repeal this ordinance. City Council may grant a time extension provided that the applicant makes a timely request in writing and submits acceptable reasons which justify the time extension.

Pursuant to paragraph 17, an extension to July 21, 1977 of the time limit to secure building permits was sought by LRI in a letter dated July 16, 1976. On August 11, 1976, the Council granted LRI an extension to January 21, 1977. On January 13, 1977, LRI requested another extension to July 21, 1977, which the Council granted on February 9, 1977.

On July 20, 1977, one day before the expiration of the extended time limit, LRI submitted a written request for an indefinite extension. This request was denied by the Council on August 31, 1977. On January 10, 1978 and again on February 15, 1978, LRI amended the request and sought an 18-month extension.

The Council responded on February 22, 1978 by passing on first reading bill no. 30 to repeal ordinance no. 4484. Bill no. 30 passed second reading on March 8, 1978. On April 5, 1978, however, further action on the bill and any requests for an extension of ordinance no. 4484 were deferred "indefinitely" by the Council due to the pending proceeding in the bankruptcy court involving THC Financial Corporation ("THC"), LRI's main creditor and mortgagee for Pulama Gardens.[2]

On August 25, 1978, LRI[3] filed in the United States District Court for the District of Hawaii ("USDCH") Bankruptcy No.

---

[2] Devco, as mortgagor, borrowed approximately $700,000 from THC for development of Pulama Gardens. THC, as mortgagee, held the 82.413 acres of Pulama Gardens as security for the mortgage.

In 1976, THC filed a Chapter X petition for reorganization under the Federal Bankruptcy Act.

[3] Specifically, LR&I Development One filed a Chapter XII petition under the Bankruptcy Act (Act) antedating the 1978 Bankruptcy Code, the substantial portions

78-00313, a voluntary petition under Chapter XII of the Federal Bankruptcy Act. In a separate action commenced by the Securities and Exchange Commission, the USDCH on January 2, 1979 appointed Chanin as temporary receiver *pendente lite* for LRI.[4]

By Deposit, Receipt, Offer and Acceptance dated November 13, 1979, Lone Star Hawaii, Inc. ("Lone Star") offered to buy the Pulama Gardens property. The sale was approved by the USDCH in an order dated March 19, 1980.[5]

Pursuant to Rule 12-43 of the Rules of Bankruptcy Procedure, the USDCH on July 7, 1980 issued an order specifically staying the Council from repealing ordinance no. 4484 and from "taking any and all actions which would adversely and detrimentally affect . . . Pulama Gardens."

In a letter to the Council dated May 22, 1981, Chanin requested an 18-month extension of ordinance no. 4484. To eliminate any doubt as to the commencement and termination of the extension period, Chanin, on June 30, 1981, amended his previous letter and requested an extension to December 31, 1982.

---

of which became effective on October 1, 1979. Under the Act, individuals and partnerships could seek reorganization under Chapter XII if they owned property encumbered by mortgage liens.

[4] Civil No. 78-0371, *Sec v. Land Research & Investment Co., Inc.*, Chanin was appointed temporary receiver for Land Research & Investment Co., Inc.; LR&I Development Co., Inc.; LR&I Development Two; and LR&I Development Four. Although LR&I Development One was not named in the pleadings due to its pending bankruptcy action, Chanin was authorized to act for it since he was the receiver for its general partner, LR&I Development Co., Inc.

[5] The sale was contingent, however, upon several "special conditions" contained in the November 28, 1979 addendum to the DROA. One of the special conditions was that Lone Star was to apply for and receive an extension of the PD-H ("Planned Development-Housing") created by ordinance no. 4484 within 120 days of acceptance of Lone Star's offer to buy Pulama Gardens. Since this condition has not yet been met, the sale to Lone Star has apparently been aborted. Instead, THC has purchased Pulama Gardens in a foreclosure sale which was approved on April 20, 1983 by the First Circuit Court in Civil No. 51404, *THC Financial Corp. v. LR&I Development One.*

At the Council's regular meeting and public hearing on August 12, 1981, oral and written testimony on Chanin's request was submitted. On August 19, 1981, the Council's Committee of the Whole met to consider the request for extension. At that time, eight councilmembers were present[6] as were deputy corporation counsel Jane Howell and acting corporation counsel Yoshiaki Nakamoto, and the following discussion took place.

Howell:    I've just had a suggestion from my last [sic], to the effect which should probably be dealt with in Executive Session. I think that's true.

\*    \*    \*

Pacarro:    Okay. Recommendation, Madam Chairman, to Exec.

Bornhorst:    Any further discussion?

Akahane:    Defer till the end of the calendar.

Bornhorst:    Are you going to discuss in Executive Session?

Pacarro:    Yes.

Bornhorst:    Naka, is that legal under the Sunshine Law in this instance?

Nakamoto:    Yes, there are court proceedings going on in this subject matter and it would be proper to go into Executive Session to discuss the legal aspects.

The committee subsequently went into executive session. When the committee reconvened in regular session in the afternoon, the following disclosure was made by councilmember Hiram Fong, Jr.:

Fong:    Okay, I understand that during the last public hearing on Pulama Gardens, the question of whether I was in conflict or not was brought up and so I would to, I guess everybody's here, so I'd like to throw it up to the Council as

---

[6] The eight councilmembers were George Akahane, Marilyn Bornhorst, Daniel Clement, Jr., Hiram Fong, Jr., Frank Loo, Toraki Matsumoto, Tom Nekota, and Rudy Pacarro. Councilmember Andrew Poepoe was not present at the meeting.

to determine whether I am in conflict or not.

Bornhorst:   As I understand it, Hiram, we don't have to determine if you're in conflict. All you have to do is disclose, if there is any reasonable possibility that somebody might think you're in conflict. If you disclose any possible . . . ask the attorneys, but I don't think we have to determine whether you're in conflict. It's just a disclosure. So are you officially disclosing that you might possibly have some conflict?

\*   \*   \*

Fong:   As I understand, in the public hearing, they were questioning my ownership of land which is about a quarter-mile to a half-mile away from this particular project along the same road.

Bornhorst:   Are you by this nature, disclosing that?

Fong:   My ownership, yes.

Bornhorst:   Okay, anything else?

Fong:   That's it.

Bornhorst:   That's your only possible conflict in Kahaluu?

Fong:   Well, I belong to a corporation that owns some land that's approximately half-a-mile away and another parcel of land that's about a mile away, but those are all in my disclosures before the Ethics Commission.

The committee then voted to report the extension request onto the floor of the Council, with councilmembers Bornhorst and Matsumoto dissenting and Andrew Poepoe excused. After discussion on the floor, the Council in a regular meeting held on the same day voted to grant LRI an extension until December 31, 1982. The vote was again six in favor of the extension, Bornhorst and Matsumoto voting against it, and Poepoe excused.

On October 16, 1981, Hui filed its complaint against Rudy Pacarro as Council chairman, the Council, and Chanin as receiver for LRI and related entities, alleging:

1. Ordinance no. 4484's time limit for LRI to secure its building permits had been violated;

2. The Revised Charter of Honolulu ("Charter") had been violated since the Council, in granting the time extensions, did

not follow the requirements for bills;

3. The Coastal Zone Management ("CZM") Act, Hawaii Revised Statutes ("HRS") Chapter 205A, had been violated because a special management area ("SMA") use permit was required before the Council could approve the extensions of time;

4. The open meeting requirement of the Charter had been violated by the Council's deliberation of the Pulama Gardens matter in executive session on August 19, 1981;

5. The failure of councilmember Fong to disclose his indirect financial interest in the Pulama Gardens project was a violation of the Charter and his vote in favor of the time extension made the approval null and void.

Chanin brought a motion for summary judgment in which Pacarro and the Council joined. By order dated February 22, 1982, the lower court granted Chanin's motion on Hui's first, second, fourth, and fifth claims of relief but entered summary judgment in favor of the Hui on its third claim although Hui had not moved for such action.

Both Chanin and Hui appealed. The issues on appeal and our answers are:

1. Were the extensions by the Council validly granted? Yes.

2. Was the open meeting requirement of the Charter violated when the Council went into executive session on August 19, 1981? No.

3. (a) Did councilmember Fong fail to satisfy the requirements of Charter section 11-103? Yes. (b) Did councilmember Fong's vote in favor of the time extension invalidate the Council's granting of the extension until December 31, 1982? No.

4. Is the Pulama Gardens project exempt from the provisions of the CZM Act, HRS Chapter 205A, because of the grandfather clause of Act 176, Session Laws of Hawaii 1975? Yes.

Before discussing the issues above, we note that the standard of review for both the trial court and the appellate court in a summary judgment proceeding is to examine the entire record to determine whether any genuine issues of material fact are present and to consider the facts properly shown and any reasonable inferences therefrom in the light most favorable to the nonmoving party. *Iuli v. Fasi,* 62 Haw. 180, 613 P.2d 653

(1980); *Lau v. Bautista,* 61 Haw. 144, 598 P.2d 161 (1979); *Costa v. Able Distributors, Inc.,* 3 Haw. App. 486, 653 P.2d 101 (1982); *Giuliani v. Chuck,* 1 Haw. App. 379, 620 P.2d 733 (1980).

I.

Turning now to the first issue on appeal, Hui contends that the Council improperly extended the time for LRI to obtain building permits under ordinance no. 4484 because Chanin's request of May 22, 1981 was not made prior to the expiration of the previously extended time limit and thus, was not a timely application. Additionally, Hui argues that the Council never validly approved any of the extensions because the time limit could only be extended by a properly adopted bill amending ordinance no. 4484. Finally, Hui argues that the ordinance automatically expired by its own terms since no extension based upon timely application was granted.

Resolution of these questions depends upon the meaning of paragraph 17 of ordinance no. 4484. We read ordinance no. 4484 as not containing any provision for automatic termination, as specifying an extendible deadline for issuance of necessary building permits, and as authorizing the Council to extend that deadline if and whenever it chose to do so. If the Council failed to extend the deadline, the ordinance would thereafter have remained valid but building permits would not have been authorized.

We disagree with Hui's contention that the time extensions granted by the Council were amendments or revisions of ordinance no. 4484 which could only be made by ordinance under section 3-204 of the Charter (1973).[7] The time extensions did nothing to change the effect or requirements of ordinance no. 4484 and were expressly sanctioned in paragraph 17. The

---

[7] Charter section 3-204 (1973) states, "No ordinance shall be amended, revised or repealed by the council except by ordinance."

granting of an extension under ordinance no. 4484 is a non-legislative act which need not be made by ordinance because "[i]n exercising its non-legislative power, the City Council may do so by resolution or by resorting to some other parliamentary procedure, such as by voting on a motion made at council meeting." *Life of the Land v. City Council of Honolulu,* 61 Haw. 390, 423-24, 606 P.2d 866, 887 (1980). *See* Charter section 3-201 (1973).

II.

Section 3-108(8) of the Charter (1973) provides in relevant part:

The council shall hold regular meetings and shall meet at least once each month. All meetings of the council shall be open to the public, and every vote taken by the council shall be by open ballot. With the exception of consultations with the corporation counsel on claims where premature public disclosure of information would adversely affect the city's interest and consultation with its own counsel or staff, all council committee meetings shall be open to the public[.]

Hui contends that this open meeting requirement was violated when the Committee of the Whole met in executive session on August 19, 1981. It alleges that the committee improperly discussed the merits of the project in this closed session, as evidenced by Committee Report No. 52 which was adopted by the Council on August 19, 1981 and stated:

Your Committee of the Whole . . . after due deliberation in Executive Session and further discussion in Committee of the Whole, recommends as follows:

1. That the foregoing request from LR&I Development One for an extension for a period to and including December 31, 1982 to obtain building permits for the Pulama Gardens Planned Development project be reported out for action today . . .

By defining the word "deliberation" as "[t]he act of weighing and examining the reasons for and against a contemplated act or course of conduct," Hui attempts to establish that the Council discussed the merits of LRI's extension request. Hui also claims that the report's use of the word "further" indicates

that discussion had already taken place in executive session. In our view, Hui's contentions do not raise a genuine issue of material fact.

In support of his motion for summary judgment, Chanin filed the affidavit of councilmember Clement in which he stated, *inter alia,* "that no discussions or votes were held during the executive session regarding the merits of the aforementioned request for an extension of time[.]"

The party responding to a properly supported motion for summary judgment may not rely on the allegations of his pleadings but must point to specific facts in the record which give rise to a genuine issue for trial. *Costa v. Able Distributors, Inc.,* 3 Haw. App. at ___, 653 P.2d at 104. Hui's exercise in semantics did not satisfy this requirement. Since there is nothing in the record contradicting councilmember Clement's affidavit, Hui has not satisfied its burden of showing that there is a genuine issue of material fact.

In view of section 3-108(8)'s restrictive language, however, we *sua sponte* raise the question of whether a potential rather than an existing claim can be discussed by the Council in a closed meeting with corporation counsel. In deciding this question, we look to the opinions of other courts which have recognized the necessity of retaining the attorney-client privilege between the Council and its legal counsel. As the court stated in *Sacramento Newspaper Guild v. Sacramento County Board of Supervisors,* 263 Cal. App. 2d 41, 56, 69 Cal. Rptr. 480, 490-91, (1968):

Settlement and avoidance of litigation are particularly sensitive activities, whose conduct would be grossly confounded, often made impossible, by undiscriminating [sic] insistence on open lawyer-client conference. In settlement advice, the attorney's professional task is to provide his client a frank appraisal of strengths and weaknesses, gains and risks, hopes and fears. If the public's "right to know" compelled admission of an audience, the ringside seats would be occupied by the government's adversary, delighted to capitalize on every revelation of weakness. . . . Frustration would blunt the law's policy in favor of settlement and financial imprudence might be a compelled path.

The ability of a public body to confer freely with its counsel is so critical that even where the open meeting law did not specifically provide for such protection, one court has held that "[w]hile exceptions to right-to-know legislative provisions are to be strictly construed, the right of a public agency privately to consult legal counsel on the settlement or avoidance of litigation is an activity properly excepted from the right-to-know acts. A public agency should neither be given an advantage, nor placed at a disadvantage in litigation." *Port of Seattle v. Rio,* 16 Wash.App. 718, 559 P.2d 18, 22 (1977); *see also Oklahoma Assoc. of Municipal Attorneys v. State,* 577 P.2d 1310 (Okla. 1978).

Charter section 3-108(8) allows the Council to privately confer with corporation counsel only on "claims where premature public disclosure of information would adversely affect the city's interest," but places no restrictions on the Council's closed consultations with "its own counsel or staff." Given this broad authorization for the Counil to meet with its own counsel and the compelling reasons for respecting the attorney-client privilege, we hold that section 3-108(8) does not prevent the Council from privately conferring with corporation counsel about potential claims nor does it require them to wait until a claim is asserted before the attorney-client privilege attaches. An open discussion of potential claims can "adversely affect the city's interest" and may be considered a "premature public disclosure" falling within the ambit of section 3-108(8). Thus, we conclude that Charter section 3-108(8) permits the Council to privately confer with corporation counsel on existing or potential claims and that the Charter's open meeting requirement was not violated in this case.

III.

A.

Section 11-103 of the Charter (1973, as amended 1978) provides:

Section 11-103. Disclosure of Interests. Any elected or appointed officer or employee who possesses or who acquires such interests as might reasonably tend to create a

conflict with the public interest shall make full disclosure in writing to his appointing authority or to the council, in the case of a member of the council, and to the ethics commission, at any time such conflict becomes apparent. Such disclosure statements shall be made a matter of public record and be filed with the city clerk. Any member of the council who knows he has a personal or private interest, direct or indirect, in any proposal before the council, shall disclose such interest in writing to the council. Such disclosure shall be made a matter of public record prior to the taking of any vote on such proposal.

Hui argues that councilmember Fong violated Charter section 11-103 by failing to make a full written disclosure of his indirect interest in the project to the Council and ethics commission prior to his voting in favor of the extension and thus urges us to invalidate the Council's approval of the extension.

By letter dated November 8, 1979, Fong had informed the city clerk that he, his two brothers, and his sister each owned an undivided one-fourth interest in a horticultural and botanical park at Kaalaea, Oahu, Tax Map Key No. 4-7-0-7:10 & 15, for which property they sought a conditional use permit from the city. On April 9, 1980, Fong wrote a letter to the Council informing it of his undivided one-fourth interest in real property situated at 47-331 Pulama Road, Kahaluu, for which one of his brothers had sought a permit to build a second dwelling for owner occupancy. It is apparent from Fong's oral disclosure at the August 19, 1981 committee meeting that the November 8, 1979 disclosure involved property different from the April 9, 1980 disclosure.

The property involved in the November 8, 1979 disclosure is located on Pulama Road near the foot of the Koolau mountains and is comprised of 218 acres. Because 67 of those acres were zoned A-1 Restricted Agricultural, the conditional use permit was needed to allow the public to visit the existing horticultural and botanical park located on the property and to establish an outdoor recreation and amusement facility.

Fong's application for a conditional use permit was approved by the city's director of the Department of Land Utilization ("DLU") on January 14, 1980. One of the require-

ments of the permit was:

4. The applicant shall satisfy all Department of Transportation requirements and shall provide improvements at his cost as may be required to Pulama Road and the Kamehameha Highway/Pulama Road intersection subject to approval of the Department of Transportation Services and Department of Transportation. A minimum of 28 feet of paved roadway shall be provided on Pulama Road. This shall be done prior to issuance of a building permit for the main structure.

In ordinance no. 4484, LRI has also been required to make improvements to Pulama Road. Condition no. 1 in the ordinance states in pertinent part:

*Road Right-of-Way and Improvement*

The portion of Pulama Road fronting the site shall be widened by an additional 8 feet on the project side and improved to the City and County standards for 56-foot right-of-ways and dedicated to the City in accordance with the Department of Public Works and Department of Transportation Services requirements. . . . Interior roads shall be no less than 24 feet wide and shall be provided with curbs and gutters.

Hui contends that Fong's property is located mauka (mountainside) of the Pulama Gardens project and that he stood to benefit financially if LRI, rather than the Fongs, made the requisite road improvements.

Viewing the evidence in the light most favorable to Hui, we conclude that Fong had an indirect personal interest in the Pulama Gardens' proposal because he would have benefited from the road improvements required by ordinance no. 4484. Therefore, Fong was required to disclose this interest pursuant to Charter section 11-103.

In *Waikiki Resort Hotel v. City and County of Honolulu*, 63 Haw. 222, 249, 624 P.2d 1353, 1371-1372 (1981), our supreme court has interpreted the precursor to section 11-103[8] as follows:

---

[8] Charter section 10-103, which the supreme court interpreted in *Waikiki Resort Hotel*, was renumbered section 11-103 in 1978.

That charter provided in Section 10-103 that any member of the city council, who knew that he had "a personal or private interest, direct or indirect," in any proposal before the council, should disclose such interest in writing to the council, the disclosure to be made a matter of public record "prior to the taking of any vote on such proposal," thus implying that, upon the filing of the required disclosure, such member was eligible to vote on the proposal.

The section also required any appointed officer of the city and county, "who possesses or who acquires" such interests as might reasonably tend to create a conflict with the public interest, to make full written disclosure to his appointing authority and to the ethics commission at any time such conflict became apparent, the disclosure to be filed with the city clerk and made a matter of public record, but, unlike the provision discussed in the preceding paragraph, was silent regarding the eligibility of such officer to vote on the matter covered in the disclosure. [Footnote omitted.]

Once a councilmember with an interest in any action pending before the Council has made the requisite written disclosure under section 11-103, rule no. 13 of the Rules of the Council of the City & County of Honolulu (February 1980) provides that such disclosure is applicable to all subsequent actions relating to the same subject matter. Thus, a member who has made the proper written disclosure is not required to make any oral disclosures or to disclose his interest each time the subject matter comes before the Council.

Although Fong disclosed his interests in the horticultural/ botanical park and other property located on Pulama Road, those disclosures were not sufficient to satisfy the requirements of Charter section 11-103. Under this section, Fong was required to have submitted to the Council a written disclosure of his indirect, personal interest in the Pulama Gardens project outlining the potential benefit to him if the road to his park property was improved by LRI. Neither of Fong's disclosures of his direct interests in nearby properties specifically notified the Council of his indirect, personal interest in the Pulama

Gardens project.[9] Moreover, Fong's oral disclosures at the August 19, 1981 meeting did not satisfy section 11-103's requirement that a full, written disclosure be made to the Council.

B.

Fong's failure to strictly comply with the disclosure requirements and his vote in favor of the extension of the time limit does not *ipso facto* invalidate the extension.

Although Charter section 11-103 implicitly disqualified Fong from voting until he made the required disclosure, the Hawaii Supreme Court has held that "where the required majority exists without the vote of the disqualified member, his participation in the deliberation and in the voting will not invalidate the result." *Waikiki Resort Hotel,* 63 Haw. at 248, 624 P.2d at 1371; citing *Singewald v. Minneapolis Gas Co.,* 274 Minn. 556, 142 N.W.2d 739 (1966); *Anderson v. City of Parsons,* 209 Kan. 337, 496 P.2d 1333 (1972). Since only five votes were necessary and Fong's was one of six votes, the extension of time until December 31, 1981 was not invalidated by Fong's vote.

IV.

In opposing Chanin's cross-appeal, Hui contends that before the Council could have granted a time extension, LRI is required to obtain an SMA use permit as provided by the Hawaii CZM Act. Section 205A-29(b), HRS, (1975, as amended 1977) provides:

(b) No agency authorized to issue permits pertaining to any development within the special management area shall

---

[9] Additionally, we note that Fong's November 8, 1979 disclosure of his interest in the park property was made to the city clerk and not to the Council as required by Charter section 11-103. Although Fong's April 9, 1980 letter to the Council of his interest in other property on Pulama Road may have met the requirements of section 11-103, this disclosure did not cover the park property.

authorize any development unless approval is first received in accordance with the procedures adopted pursuant to this part. For the purposes of this subsection, county general plan, state land use district boundary amendments, and zoning changes are not permits.

LRI contends, however, that it is completely exempt from the requirements of the Hawaii CZM Act due to the "grandfather clause" contained in section 3 of Act 176, Session Laws of Hawaii 1975, which states:

> This part shall not apply to developments or structures for which a building permit, planned development permit, planned unit development permit or ordinance, or special permit for cluster development was issued prior to December 1, 1975, or to subdivisions of property into single family residential lots of one acre or less which have received final approval and on which subdivision improvements including but not limited to grading, utilities, roads, street lighting and all required on-site and off-site improvements have been completed prior to December 1, 1975. This part shall not apply to interior renovations.

We interpret the first part of the grandfather clause as concerning developments for which special permits or ordinances have been issued prior to December 1, 1975. The second part of the clause deals with residential subdivisions which have received final government approval and on which certain specified improvements have been completed prior to December 1, 1975.

Hui argues that the term "developments" in the first part of the grandfather clause means "actual developments," not some conceptual proposal or plan to construct buildings or make improvements in the future. It points to HRS section 205A-22(3) (Supp. 1982) which defines "development" as follows:

> (3) "Development" means any of the uses, activities, or operations on land; in or under water, within the special management area. . .:
>> (A) "Development" includes the following:
>>> (i) The placement or erection of any solid material or any gaseous, liquid, solid, or thermal waste;
>>> (ii) Grading, removing, dredging, mining, or

extraction of any materials;

(iii) Change in the density or intensity of use of land, including but not limited to the division or subdivision of land;

(iv) Change in the intensity of use of water, ecology related thereto, or of access thereto; and

(v) Construction, reconstruction, demolition, or alteration of the size of any structure.

Hui is giving an unduly restrictive meaning to a word which, by its statutory definition, merely "includes" illustrations of actual work in progress.[10] Also, unlike the second part of the grandfather clause which requires actual completion of certain improvements by December 1, 1975, nothing in the first part requires the developments to be ongoing or to have completed construction by that deadline. Moreover, by referring to "a building permit, planned development permit, planned unit development permit or ordinance, or special permit for cluster development," the inference is that the development is still in the planning stages since these permits or ordinances are required prior to actual construction. Therefore, we conclude that the natural and most obvious import of the grandfather clause is that the requirements of the Hawaii CZM Act are not applicable to any development, existing or planned, for which one of the aforementioned permits was issued or ordinances was passed prior to December 1, 1975.

In this case, ordinance no. 4484 authorizing the Pulama Gardens planned development was adopted by the Council on July 21, 1975, more than four months prior to the December 1 deadline for grandfathered projects. Thus, we hold that the project is exempt from the requirements of the Hawaii CZM Act.

We reverse the partial summary judgment in favor of Hui and affirm the partial summary judgment in favor of Chanin. We remand for entry of a complete summary judgment in favor of Chanin.

---

[10] Note, too, that illustrations (iii) and (iv) are not necessarily "actual" changes in density or intensity but can also mean "planned" changes.

*Ronald Albu,* Legal Aid Society of Hawaii, for appellant, cross-appellee.

*Riccio M. Tanaka* (*Tamotsu Tanaka* and *J. Ken Petersen* with him on the briefs; *John A. Chanin* on the opening brief) for appellee, cross-appellant Chanin.

*Jane H. Howell,* Deputy Corporation Counsel, for appellees, cross-appellants Pacarro and Honolulu City Council.