COOL HOMES, INC., an Alaska
Corporation, Appellant,

v.

FAIRBANKS NORTH STAR BOROUGH,
Tax Foreclosure List by the Fairbanks
North Star Borough Against Certain
Real Property Located Therein and De-
scribed in This Petition, Appellee.

COOL HOMES, INC., an Alaska
Corporation, Appellant,

v.

FAIRBANKS NORTH STAR
BOROUGH, Appellee.

COOL HOMES, INC., an Alaska Corpora-
tion, and Ben Lomond, Inc., a Utah
Corporation, Appellants,

v.

FAIRBANKS NORTH STAR BOROUGH
BOARD OF EQUALIZATION,
Appellee.

FAIRBANKS NORTH STAR BOROUGH
BOARD OF EQUALIZATION,
Cross–Appellant,

v.

COOL HOMES, INC., an Alaska
Corporation, Cross–
Appellees.

Nos. S–3995, S–4337, S–4338 and S–4353.

Supreme Court of Alaska.

Oct. 29, 1993.

Brent M. Wadsworth, Wadsworth & Associates, Anchorage, for appellants/cross-appellees.

Eugene Hardy, Borough Atty., Mark Andrews, Asst. Borough Atty., Fairbanks, for appellee/cross-appellant.

David H. Call, Call, Barrett & Burbank, Fairbanks, for Aetna Life Ins. Co., amicus curiae.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

PER CURIAM.

These cases arise out of the refusal of Cool Homes, Inc. (Cool Homes) to pay prop-

erty taxes assessed against it by the Fairbanks North Star Borough (Borough). The appeals raise the following separate issues.

The issue in No. S–3995 is whether the superior court erred in granting summary judgment against Cool Homes in the Borough's action to foreclose Cool Homes' interest in its buildings on Eielson Air Force Base. The court ordered the buildings sold and transferred to the Borough for the amount of taxes, penalties, interest, advertising costs and legal fees for which the property is liable.

No. S–4337 arises out of an action by the Borough for a personal judgment against Cool Homes. The Borough sought the personal judgment to recover the property taxes assessed against Cool Homes' leasehold interest in the land, including statutory penalties and interest. The superior court granted summary judgment in favor of the Borough. The issue thus is whether Cool Homes may be held personally liable under the assessment and foreclosure statutes.

Nos. S–4338–4353 raise several discrete issues concerning the reassessment of the Cool Homes' properties, including whether the Borough violated the Open Meetings Act during the reassessment process, the relative burdens on the taxing authority and the property owner, adjustments for lease restrictions and whether the superior court abused its discretion in permitting supplementation of the record on appeal.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

The backdrop for these appeals is set forth generally in *Ben Lomond, Inc. v. Fairbanks North Star Borough Board of Equalization*, 760 P.2d 508 (Alaska 1988). Cool Homes, the successor in interest to Ben Lomond, Inc. (Ben Lomond), owns approximately three hundred units of housing on Eielson Air Force Base. Ben Lomond constructed these houses on land leased in 1985 from the federal government. This Land Lease runs for twenty-three years

and provides for a nominal lease rental. The federal government, in turn, leased the housing development and underlying land from Ben Lomond for an annual lease rental of $3,600,000.00 plus an annual maintenance fee. The term of this "Project Lease" is twenty years, running concurrently with the last twenty years of the Land Lease.

The Land Lease is authorized under 10 U.S.C. § 2667, which provides:

(a) Whenever the Secretary of a military department considers it advantageous to the United States, he may lease to such lessee and upon such terms as he considers will promote the national defense or be in the public interest, real or personal property that is

(1) under the control of that department;

(2) not for the time needed for public use; and

(3) not excess property, as defined by section 3 of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 472).

. . . .

(e) The interest of a lessee of property leased under this section may be taxed by State or local governments. A lease under this section shall provide that, if and to the extent that the leased property is later made taxable by State or local governments under an Act of Congress, the lease shall be renegotiated.

The Project Lease is authorized under the Military Construction Authorization Act of 1984 (Act), Section 801, codified as 10 U.S.C. § 2828. The Act inaugurated a test program "to determine if leasing is more cost effective to the [United States] than the traditional method of constructing [military] housing with appropriated funds." While the Act does not refer specifically to taxation, there is no indication that 10 U.S.C. § 2828 was intended to supersede 10 U.S.C. § 2667, which provides for taxation of private interests.

The terms of the lease between the federal government and Ben Lomond specifically address Ben Lomond's responsibility for taxes assessed against the property. Condition 13 of the Land Lease provides:

> That the Lessee [Cool Homes] shall pay to the property authority, when and as the same become due and payable, all taxes, assessments, and similar charges which, at any time during the terms of this lease, may be taxed, assessed, or imposed, upon the Lessee's interest in the leased premises. In the event any taxes, assessments, or similar charges are imposed, with the consent of Congress upon property owned by the Government and included under this lease (as opposed to the leasehold interest of the Lessee therein), they shall be paid (1) by the Government, in which event this lease shall then be renegotiated to increase the consideration provided above in the amount of such taxes, assessments, or similar charges paid by the United States, or (2) at the option of the Government, by the Lessee.

Article VII of the Project Lease provides, in pertinent part:

> Lessor [Cool Homes] shall pay all taxes, general or special, all public rates, dues, and special assessments of every kind which shall become due and payable or which are to be assessed against or may be levied upon said Premises during the terms of this Lease.

The Borough assessed the property for the years 1986, 1987 and 1988. Although the Borough mailed property tax bills to Cool Homes for each of these years, the corporation has paid no part of the property taxes. Pursuant to AS 29.45.210(d), Cool Homes sought judicial review of each assessment. The superior court upheld the Borough's right to tax Cool Homes' interest, but remanded all of the assessments to the Borough Board of Equalization (Board) for recalculation of the amount based on a twenty-three year lease, rather than on a forty-year lease.

In affirming Cool Homes' obligation to pay property taxes, we held that "Lomond's [now Cool Home's] twenty-three year leasehold interest in land at Eielson Air Force Base and its twenty year interest in the improvements it constructed upon the land are both taxable interests under the Borough's real property taxation statutes." *Ben Lomond*, 760 P.2d at 513.

The exact amount Cool Homes owed was still in dispute following our decision. The Board reassessed the property in May 1989. The superior court affirmed these assessments. *Cool Homes, Inc. v. Fairbanks Northstar Borough Board of Equalization*, No. 4FA–89–1078 Civ. (Alaska Super., November 19, 1990). This proceeding was a consolidated appeal of the 1986–89 assessments. Cool Homes appealed. *See* Nos. S–4338, 4353.

The Borough also filed an action for a personal judgment against Cool Homes. The superior court granted the Borough summary judgment in that case as well. *Fairbanks Northstar Borough v. Cool Homes, Inc.*, No. 4FA–89–1415 Civ. (Alaska Super., November 19, 1990). Cool Homes appealed. *See* No. S–4337.

Prior to the superior court's decision in the reassessment proceeding, the Borough filed a petition for judgment of foreclosure against Cool Homes. The petition was part of the Borough's annual general *in rem* foreclosure action. The Borough submitted its delinquent tax foreclosure list and published the list for four consecutive weeks in a newspaper of general circulation. Cool Homes filed an answer and objection to the foreclosure action. Pursuant to AS 29.45.390(a), the court separated Cool Homes' property from the *in rem* proceeding and dealt with it separately. The Borough filed a Motion for Summary Judgment as to Cool Homes. Following briefing and oral argument, the court granted the Borough's Motion for Summary Judgment and ordered Cool Homes' interest foreclosed. Cool Homes appealed. *See* No. 3995.

## II. *DISCUSSION*

### A. No. S–3995

#### 1. STANDARD OF REVIEW

■ "When reviewing a grant of summary judgment, this court must determine whether there was a genuine issue of material fact and whether the moving party was entitled to judgment on the law applicable to the established facts." *Merdes v. Underwood*, 742 P.2d 245, 248 (Alaska 1987) (quoting *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1280 (Alaska 1985)). The court considers matters of law *de novo* and adopts rules of law which are most persuasive in light of precedent, reason and policy. *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

#### 2. THE BOROUGH'S MOTION FOR SUMMARY JUDGMENT

##### a. Cool Homes Has a Property Interest Subject to Foreclosure.

■ Cool Homes distinguishes its two interests that have been taxed. First, it has a leasehold interest in the land upon which it constructed military housing.[1] Second, it has an ownership interest in the buildings it constructed. Cool Homes argues that the buildings cannot be considered real property absent any connection to the land. According to Cool Homes, its interest in the buildings is not subject to real property taxes since the federal government owns the underlying land. Cool Homes concedes that the buildings are taxable as personal property, but maintains that they are not subject to foreclosure.

The Borough asserts that governments traditionally enforce liens on taxable interests in tax-exempt property. It cites cases from other jurisdictions in support of the position that it may foreclose upon the ownership interest in the improvements, notwithstanding the location of the buildings on tax-exempt federal property. The Borough argues that such separation of property interests for tax purposes is permitted under article IX, section 4 of the Alaska Constitution.[2]

We agree with the Borough. In *Ben Lomond*, 760 P.2d at 513, we stated that Ben Lomond's [now Cool Homes'] "interest in the improvements it constructed upon the land [is taxable] under the Borough's *real property* taxation statutes." *Id.* (emphasis added). Cool Homes' argument that the buildings are personal property because the corporation does not own the underlying land ignores the court's previous explicit holding that the improvements are real property.[3]

Cool Homes' argument that the Borough cannot foreclose on the buildings to collect delinquent taxes is also without merit. Ownership of property consists of a bundle of separate rights, powers and privileges. *See e.g.*, Wm. E. Burby, *Handbook on the Law of Real Property* § 9, at 13–14 (3rd ed. 1965). Although Cool Homes does not own the underlying land, it owns the buildings it constructed on Eielson Air Force Base.

There appears to be no insurmountable difficulty in foreclosing on the houses without foreclosing on the land. This was the situation in *Brown v. Hart*, 213 Mont. 517, 692 P.2d 14 (1984), where the court upheld

---

**1.** Cool Homes concedes that its leasehold interest is taxable. It argues that the Borough cannot foreclose on it since the land is owned by the federal government. However, the Borough did not foreclose on Cool Homes' leasehold interest.

**2.** Article IX, section 4 of the Alaska Constitution permits "[a]ll, or any portion of, property" to be exempt from taxation.

**3.** *See City of Nome v. Catholic Bishop of Northern Alaska*, 707 P.2d 870 (Alaska 1985), as an example of the practice of separating property interests for tax purposes. In *City of Nome*, we held that article IX, section 4 mandates spatial apportionment of all property into exempt and nonexempt portions. *Id.* at 881. Thus, the city could not tax portions of a church used exclusively for religious, charitable or educational purposes, but could tax other portions of the same building. *Id.* at 887.

the tax sale of a privately owned cabin on federal land. In *Brown*, the court stated:

> The cabin in question is located on Forest Service land on Seeley Lake. It was built more than twenty years ago and, although it lacks a foundation, is "affixed" to the land by means of water and sewer lines. No hair-splitting distinctions are, however, required. The cabin, so long as it remains upon the land, is real property.... An objective test applies: the taxing authority need only observe the structure; the present or future intentions of the parties are irrelevant. The cabin is a building resting on the land. The fact that it may be moved or may have to be removed in the future does not, for tax and recording purposes, change the nature of the cabin as real property.

692 P.2d at 15–16. *See also First National Bank of Beresford, South Dakota v. Anderson*, 332 N.W.2d 723, 726 (S.D.1983) (holding that real estate can be severed to preserve a homestead exemption and the non-exempt remainder ordered sold to satisfy a civil money judgment).

■ *Brown* is not distinguishable simply because Cool Homes' interest is non-possessory. The non-possessory nature of Cool Homes' interest precludes neither taxation nor foreclosure.[4]

The federal government is in a position similar to that of a tenant whose landlord has failed to pay property taxes. The tenant cannot prevent foreclosure by the taxing authority, just as the tenant cannot prevent foreclosure by a private creditor if the landlord fails to make mortgage payments.[5]

### b. Cool Homes' Appeal of its Tax Assessment and the Superior Court's Remand for Reassessment Precludes Foreclosure.

■ Cool Homes argues that no valid tax assessment existed until May 22, 1989, when the Board of Equalization reassessed the property following remand of the 1986–88 assessments to it by the superior court. Since Alaska statutes provide that an annual foreclosure list must be based on the previous year's assessment, AS 29.45.330, Cool Homes argues that foreclosure on the 1989 assessment could not occur until 1990. Cool Homes also argues that interest and penalties could not begin to accrue against the corporation until May 22, 1989, when a valid assessment was made.

The Borough argues that Alaska statutes require a landowner to pay the taxes assessed and then sue for a refund if the taxpayer believes the assessment is erroneous. According to the Borough, Cool

---

**4.** A lessor is generally liable for taxes on the leased property even though the lessor's interest is non-possessory and represents only a fraction of the total value of the property. Frank M. Keesling, *Property Taxation of Leases and Other Limited Interests*, 47 Calif.L.Rev. 470, 476–77 (1959). In this case, the project lease specifically provided that Cool Homes was liable for any taxes assessed against the property. Under Alaska law, property taxes are a lien upon the property assessed which may be foreclosed for failure to pay the taxes owned.

Alaska Statute 29.45.300(b) provides:
Property taxes, together with penalty and interest, are a lien upon the property assessed, and the lien is prior and paramount to all other liens or encumbrances against the property.
Alaska Statute 29.45.320(a) provides:
The municipality shall enforce delinquent real property tax liens by annual foreclosure, unless otherwise provided by ordinance.

**5.** Cool Homes' reliance on *City of Anchorage v. Baker*, 376 P.2d 482 (Alaska 1962), is misplaced. First, *Baker* involved the interpretation of a territorial law no longer in effect. Second, the interest at issue in this appeal is not a leasehold interest. Cool Homes owns the buildings it constructed at Eielson Air Force Base. Finally, the holding in *Baker* is much narrower than Cool Homes suggests. Contrary to Cool Homes' belief, the court did not hold that foreclosure of leasehold interests *in general* is fruitless. The court held that foreclosure of Baker's leasehold would be of no value to the city because the written lease between Baker and the Alaska Railroad provided for forfeiture of Baker's rights if he failed to pay all taxes levied against improvements on the land. *Baker*, 376 P.2d at 483.

Homes could have avoided the interest and penalties as well as foreclosure, by paying the taxes assessed against it. The Borough also asserts that Cool Homes could have stayed execution of the tax assessment pending appeal by posting bond. Since Cool Homes has failed to pay any of its property taxes and failed to post bond to stay execution of tax enforcement, the Borough argues that it is entitled to foreclose on Cool Homes' buildings.

██ Alaska statutes provide aggrieved taxpayers with a number of remedies. The taxpayer may pay taxes under protest and then sue for a refund. If the taxpayer is entitled to a refund, he or she receives interest and costs, in addition to the amount of taxes that had been collected in error. AS 29.45.500(a).[6] In addition, a taxpayer can obtain a stay of the tax execution pending appeals to the superior and supreme courts by posting bond. *City of Nome v. Catholic Bishop of Northern Alaska,* 707 P.2d 870, 878 (Alaska 1985). Alaska R.App.P. 204, 603.

However, in the case before us the taxpayer has proceeded beyond the appeal stage. The taxpayer has obtained a reversal of the action of the Board and vacation of the assessment, and the matter has been remanded to the Board to rectify its errors.[7]

We summarily rejected [8] the Borough's argument that it may proceed with foreclosure notwithstanding the superior court's remand to the Board of Equalization for reassessment.[9] Since the amount of the tax due had not been determined when the Borough initiated foreclosure, the amount of its lien had not been established. Interest and penalties could not be determined, since there was no figure on which to base them. The taxpayer's right of redemption was impaired, because the taxpayer could not ascertain what amount it had to pay to avail itself of the right.[10]

c. Penalties and Interest.

In calculating the tax obligations on remand the superior court must decide whether late payment penalties and interest on the tax lien are appropriate. We thus address the issue of whether interest and penalties should run from the original

---

**6.** AS 29.45.500(a) provides:

> If a taxpayer pays taxes under protest, the taxpayer may bring suit in the superior court against the municipality for recovery of the taxes. If judgment for recovery is given against the municipality, or, if in the absence of suit, it becomes obvious to the governing body that judgment for recovery of the taxes would be obtained if legal proceedings were brought, the municipality shall refund the amount of the taxes to the taxpayer with interest at eight percent from the date of payment plus costs.

**7.** Thus, we need not address whether the filing of an appeal of a tax assessment, standing alone, precludes foreclosure.

**8.** The appeal in this case, No. S–3995, was argued prior to the appeals in the three other *Cool Homes* cases. Following oral argument in No. S–3995, we entered an order which provided in part:

> IT IS ORDERED:
> 1. The judgment and decree of foreclosure entered by the superior court on May 7, 1990, in case 4FA 89–405 Civil is REVERSED.

> 2. Additional consideration of this appeal is stayed pending submission of the following appeals to the court for consideration on the merits.

| | |
|---|---|
| S–4337 | Cool Homes, Inc. v. Fairbanks North Star Borough (4FA 89–1415 Civil) |
| S–4338/S–4353 | Cool Homes, Inc. and Ben Lomond, Inc. v. Fairbanks North Star Borough Board of Equalization (4FA 89–1078) |

**9.** We also reject the Borough's contention that Cool Homes' failure to avail itself of any of the statutory remedies for paying the taxes under protest or staying execution makes foreclosure possible immediately upon reassessment.

**10.** Cool Homes also argues that questions of material fact exist which preclude summary judgment. These issues arise from the charging of penalties and interest prior to the date of assessment and the Borough's alleged non-compliance with the statutory requirements for foreclosure. Both of these issues, however, are actually legal determinations. Because we hold as we do, we need not address the legal issues. However, to offer guidance for remand, the interest and penalties issues are discussed below.

due date for each tax year or only from the date of reassessment after remand.[11]

The superior court ordered foreclosure on a tax lien which included statutory penalties and interest, dating back to 1986, 1987 and 1988. Cool Homes contends that this is improper because the tax assessment after remand was not made until May 1989. The Borough argues that the interest and penalties may be properly dated back to the original due date as distinguished from the actual date of assessment following an appeal.

■■■ Alaska statutes allow a municipality to add a penalty to all "delinquent" taxes and provide that interest may accrue "from the due date." AS 29.45.250. Interest and penalties serve different functions and thus separate standards are appropriate. Penalties are meant to punish a party for late payment. Interest, however, is not punitive.[12] Rather, it is intended to compensate the party to whom the sum is owed for the use of the money during the period of nonpayment. *Lundgren v. Gaudiane*, 782 P.2d 285, 289 (Alaska 1989).[13] Neither prejudgment nor postjudgment interest depends on which party is at fault for the delay. *Farnsworth v. Steiner*, 638 P.2d 181, 184–85 (Alaska 1981).

■■■ We have previously held that for the purposes of former AS 29.53.180, the precursor to AS 29.45.250,[14] there can be no *delinquency* until a "valid" tax is assessed. *Alascom, Inc. v. North Slope Bor-*ough, Bd. of Equalization*, 659 P.2d 1175, 1180 (Alaska 1983). In *Alascom*, the municipality failed to list certain real property on its tax rolls and the property therefore "escaped" taxation. Instead the property was assessed in 1979 for the six prior years. *Id.* at 1177. We held that interest and penalties were not authorized because of the municipality's failure to discharge its responsibility as to real property to timely assess the property and notify the taxpayer. We stated:

> As to real property the responsibility for assessing taxable parcels and for notifying a taxpayer of his tax liability rests solely with the borough. As we have previously ruled, a tax on real property is ineffective until the borough discharges its responsibilities by making an assessment, notifying the taxpayer of his liability, and providing the taxpayer with an opportunity to pay his taxes. Until the borough has exercised its right to demand real property taxes in the manner provided by statute there can be no valid tax and hence no delinquency within the meaning of AS 29.53.180, which authorizes penalties and interest on delinquent taxes.

*Alascom*, 659 P.2d at 1180 (footnote omitted). This rationale is not applicable where the municipality makes an assessment of the real property in question, but makes a mistake as to the amount of the assessment. In such a case the property owner is aware that taxes are being demanded and

---

11. Cool Homes claims that this imprecision in the amount is grounds alone for reversing the summary judgment. Because we reverse the summary judgment on other grounds, Cool Homes need not rely on this argument. However, we note that this imprecision does not create a genuine issue of material fact so that summary judgment would be reversed. Instead, the proper action would be to vacate the judgment with respect to amount only and remand for a determination of the proper amount. This same analysis applies to the interest and penalties issue raised by Cool Homes in S–4337.

12. "The assessment of interest for late payment has no punitive element. While it is logical to relieve a taxpayer of paying a penalty, where

under the circumstances such as this he has been guilty of no misconduct, interest stands on different footing. It is non-pejorative." *North Slope Borough v. Sohio Petroleum Corp.*, 585 P.2d 534, 546 (Alaska 1978).

13. A corollary purpose is to deprive the party that held the money from being unjustly enriched because of use of the money. *Lundgren*, 782 P.2d at 289.

14. The material language that penalties may be assessed on "delinquent" taxes and interest shall accrue "from the due date" is present in both statutes. AS 29.45.250; former AS 29.53.180.

can pay them immediately under protest, AS 29.45.500, or it can take an administrative appeal to the Board of Equalization, AS 29.45.190, and to the superior court, AS 29.45.200. The taxpayer whose property is timely assessed should be aware that in all likelihood its property will generate some tax liability and can plan for that eventuality. *Alascom* does not stand for the proposition that interest on taxes imposed on property which is timely assessed should not relate back to the original due date.

▮▮ However, we view *Alascom* as authority with respect to penalties. Although the question is a close one and the applicable statute, AS 29.45.250, gives no guidance, it seems appropriate to require an error free assessment before penalties can be imposed. Thus, in this case, penalties may be charged only from the due date which follows May 22, 1989. The superior court erred in charging Cool Homes penalties which dated back to 1986, 1987 and 1988.

▮▮ With respect to interest, the "due date" refers to when the cause of action arises and not when a judgement is awarded. "When a cause of action arises, the injured party become immediately entitled to be made whole, and the amount later adjudicated as damages becomes *due.*" *Farnsworth,* 638 P.2d at 183. Thus the interest on a tax assessment runs from the due date in the year of the original assessment rather than from the date of reassessment.

### B. No. S-4337
### THE PERSONAL ACTION AGAINST COOL HOMES

The Borough filed a personal action against Cool Homes to recover the taxes assessed on Cool Homes' leasehold interest in the land on Eielson Air Force base. The superior court granted summary judgment in favor of the Borough. *Fairbanks North Star Borough v. Cool Homes, Inc.,* Case No. 4FA–89–1415 Civil (Sup.Ct. Nov. 19, 1990). Cool Homes contends that summary judgment was inappropriate because genuine issues of material fact exist and because the superior court improperly applied the law.

### a. Standard of Review.

▮▮ When reviewing a grant of summary judgment, this court must determine whether a genuine issue of material fact exists and whether the moving party is entitled to judgment as a matter of law. *Merdes v. Underwood,* 742 P.2d 245, 248 (Alaska 1887).[15]

### b. Propriety of a Personal Action.

Cool Homes asserts that summary judgment is improper because the foreclosure action alone compensates the Borough for all unpaid taxes. It contends that the superior court erred as a matter of law in its interpretation of AS 29.45.320.

▮▮ Alaska Statute 29.45.320(b) authorizes a personal action against the delinquent taxpayer if a tax assessed on a taxable interest in tax-exempt property is not paid.[16] Cool Homes claims that this means only that a tax delinquency on an interest in real property which is not foreclosable may be remedied through a personal action. Cool Homes concludes that a taxing authority may institute a personal action

---

**15.** The Borough notes that the superior court's order of summary judgment was without a statement of reasons. In such cases, this court presumes that the superior court ruled in movant's favor on all of the grounds put forward by the movant. "Accordingly, the summary judgment should be reversed only if no ground asserted supports the trial court's decision." *Reed v. Municipality of Anchorage,* 741 P.2d 1181, 1184 (Alaska 1987). The Borough asserted the following grounds in support of its motion for summary judgment: 1) The Borough

may bring this personal action to enforce tax liens when foreclosure is ineffective; 2) the foreclosure judgment in the superior court collaterally estops Cool Homes from contesting the validity and valuation of the tax liens; and 3) Cool Homes cannot withhold payment of its assessed taxes pending exhaustion of its judicial remedies. However, since we have reversed the foreclosure, we need only consider the first and third grounds.

**16.** Alaska Statute 29.45.320(b) reads:

only if the property is not subject to foreclosure. We disagree.

Alaska Statute 29.45.320(b) authorizes a personal action to collect a delinquent tax assessed on a taxable interest in tax-exempt property. Cool Homes's taxable interest is its leasehold interest in real property owned by the United States, which is tax-exempt property. Cool Homes' unpaid tax is subject to a personal action.

Cool Homes also contends that the possible overlapping of a foreclosable interest and an interest subject to the personal judgment creates a genuine issue of material fact. We disagree.

Alaska Statute 29.45.320(b) specifically states that the personal action remedy is available "in addition to other remedies available to enforce the lien." Foreclosure is another remedy available to enforce the lien and the personal action may be pursued in addition to foreclosure.[17]

### C. Nos. S–4338/4353

Cool Homes appeals affirmance of the property taxes assessed by the Borough

and seeks remand to the Borough's Board of Equalization for redetermination. The Board cross-appeals, claiming that the superior court, on intermediate review, improperly supplemented the record.

### 1. THE BOARD DID NOT VIOLATE THE OPEN MEETINGS ACT

a. Standard of Review.

Whether or not the Board complied with the Open Meetings Act, AS 44.62.310, is a question of law. This court may substitute its judgment for that of the superior court. *Ben Lomond, Inc. v. Fairbanks North Star Borough, Bd. of Equalization,* 760 P.2d 508, 511 (Alaska 1988).

b. The Board's Executive Session Was Not Improper.

On May 3, 1989, the Board convened to review the Borough's assessment of Cool Homes' property. Its first order of business was to call an executive session to discuss "the ins and outs and status of both Cool Homes and the Alaska Housing cases" and "litigation."[18] Mark Andrews,

---

If the tax on property described in AS 29.45.070 or on a taxable interest in tax-exempt property is not paid when due, a municipality may enforce the tax by a personal action against the delinquent taxpayer brought in the district or superior court, in addition to other remedies available to enforce the lien.

17. Cool Homes also claims that a genuine issue of material fact exists with respect to value because there is uncertainty whether the Borough followed the proper procedure in assessing the tax. Cool Homes contends that adequate notice was not provided. That is, the Borough never disclosed to Cool Homes the amount which gave rise to the foreclosure action. Moreover, the notice which was given for the entire assessment was in error.

Although this may be a compelling point, Cool Homes does not point to any affirmative proof in the record that the debt was treated as one debt for notice purposes. Instead it cites the absence of indications that the proper procedures were followed. Cool Homes had failed to raise a genuine issue of material fact to preclude summary judgment.

Cool Homes also claims that summary judgment was precluded because the amount of the

judgment was in dispute as interest and penalties were miscalculated. We held in S–3995 that this uncertainty alone does not preclude summary judgment.

18. The Board's action was as follows:

MADAM CHAIR: We are going to entertain a motion to go into an Executive Session for the purpose of discussing personnel?

MR. ANDREWS: No, it's not personnel. The purpose of this will be the ins and outs and status of both Cool Homes and the Alaska Housing cases.

MADAM CHAIR: Okay. I thought it had to be personnel or jeopardy.

[UNKNOWN VOICE]: Well, this is (indiscernible—simultaneous speech).

MADAM CHAIR: Okay. Okay. Litigation, fine.

After being asked by Cool Homes to explain the purpose of the session, the chairwoman stated: "It is simply to bring us back in review of what has happened in the year between the last session and today as to the Court findings...."

The act limits the subjects considered in the executive session to "those mentioned in the motion calling for the executive session unless auxiliary to the main question." AS 44.62.310(b).

who served as both the Board's and the Borough's attorney, was present at the session. The session was held over Cool Homes' objection.[19]

Cool Homes contends that this executive session was in violation of the Open Meetings Act, AS 44.62.310.[20] Cool Homes thus asks that the Board's actions be rendered void.

The Open Meetings Act requires that all meetings of any administrative board be open to the public. The act allows for certain excepted subjects to be discussed at executive sessions closed to the public. Among those excepted subjects are "matters which by law, municipal charter, or ordinance are required to be confidential." AS 44.62.310(c)(3). The remedy provided by the Act is to void all action taken contrary to the Act. AS 44.62.310(f).

The superior court found that the Act was not violated because the executive session with the Board's attorney was a protected communication. The court held that "[b]ecause the attorney-client privilege op-

erates concurrently with AS 44.62.310 although it is not an expressed exception, the Board's executive session, called to discuss the status of this case with its attorney, did not violate AS 44.62.310."

The Board claims that it is proper to assert the privilege in this case because the Board members had been threatened with personal liability if they failed to follow the directions given by the courts in the numerous appeals which preceded the hearing. Just three months before the hearing, Superior Court Judge Richard D. Savell specifically suggested that Mr. Andrews, in his capacity as the Board's counsel, advise the Board that any appearance of noncompliance with previous orders could potentially expose them to personal financial liability.[21] Thus, the executive session was merely to allow the Board members to receive legal advice to protect themselves from personal liability.

■ The lawyer-client privilege is set out in Evidence Rule 503: "A client has a privilege to refuse to disclose and to pre-

---

**19.** The Board sought to have this issue litigated before the hearings went further to spare the Board from having to rehear the claims should the executive session be declared unlawful. The superior court did not rule on this issue, however, until after the hearings were held.

**20.** Alaska Statute 44.62.310 provides:
 Government meetings public. (a) All meetings of a legislative body, of a board of regents, or of an administrative body, board, commission, committee, subcommittee, authority, council, agency, or other organization, including subordinate units of the above groups, of the state or any of its political subdivision, including but not limited to municipalities, boroughs, school boards, ... agencies, assemblies, councils, departments, division, bureaus, commissions or organizations, advisory or otherwise, of the state or local government supported in whole or in part by public money or authorized to spend public money, are open to the public except as otherwise provided by this section....
 (b) If excepted subjects are to be discussed at a meeting, the meeting must first be convened as a public meeting and the question of holding an executive session to discuss matters that come within the exceptions contained in (c) of this section shall be determined by a majority vote of the body. Sub-

jects may not be considered at the executive session except those mentioned in the motion calling for the executive session unless auxiliary to the main question. Action may not be taken at the executive session.
 (c) The following excepted subjects may be discussed in an executive session:
 ....
 (3) matters which by law, municipal charter, or ordinance are required to be confidential.
 ....
 (f) Action taken contrary to this section is void.

**21.** "[C]ounsel can tell [the Board] in his professional discretion and in a manner of professional advice-giving that any such appearance would be looked upon with the displeasure by the Court and carry with it, assuming for the purposes of warning that has or could take place, that could carry with it financial costs which might not be borne by the Borough alone."
 According to the Borough, Judge Savell's warning was the result of Cool Homes' repeated castigation of, and threats of contempt actions against, the Board for ignoring the court's directions.

vent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client ... between himself ... and his lawyer." Alaska R.Evid. 503(b). A "client" includes an "organization or entity, either public or private." Alaska R.Evid. 503(a)(1). Thus, the Board may exercise the privilege.[22]

The threshold question is thus whether the Open Meetings Act and the lawyer-client privilege can coexist. Cool Homes argues that they can, but not in this situation. We disagree.

■ The policies underlying the principle of open meetings are set out in AS 44.62.312. Among these is that "the people's right to remain informed shall be protected so that they may retain control over the instruments they have created." AS 44.62.312(a)(5). Thus, the applicability of the lawyer-client privilege must be narrow to afford this objective maximum realization. In *The Sacramento Newspaper Guild v. Sacramento County Board of Supervisors*, 263 Cal.App.2d 41, 58, 69 Cal. Rptr. 480 (1968) (since superseded by statute), relied upon by the superior court below, the California Court of Appeals noted the importance of limiting the privilege:

> The two enactments are capable of concurrent operation if the lawyer-client privilege is not overblown beyond its true

dimensions.... Public board members, sworn to uphold the law, may not arbitrarily or unnecessarily inflate confidentiality for the purpose of deflating the spread of the public meeting law. Neither the attorney's presence nor the happenstance of some kind of lawsuit may serve as the pretext for secret consultations whose revelation will not injure the public interest.

■ Other jurisdictions have limited a lawyer-public body exception to their open meeting acts to consideration of *pending* litigation. Such a limitation reflects a concern that when the public body is a party to a lawsuit, it should not be disadvantaged by allowing its opponents access to its meetings with counsel. *Smith County Educ. Ass'n v. Anderson*, 676 S.W.2d 328, 334 (Tenn.1984) (would impair the attorney's ability to fulfill ethical duties as an adjunct of the court); *Oklahoma Ass'n of Mun. Attorneys v. State*, 577 P.2d 1310, 1315 (Okla.1978) (might seriously impair the ability of the public body to process a claim or conduct pending litigation); *Channel 10, Inc. v. Independent School Dist. No. 709, St. Louis County*, 298 Minn. 306, 215 N.W.2d 814, 825–26 (1974) (the machinery of justice would be adversely affected if clients were not free to discuss legal matters with their attorneys without fear of disclosure).[23] The exception is not appropriate for "the mere request for general

---

**22.** According to the borough ordinance governing Board hearings, "Formal rules of evidence do not apply; however, all evidence must be relevant to the matter being heard." FNSB 3.24.015. Thus, it is arguable that the Evidence Rules do not apply at all in this case. Rather, the lawyer's ethical duty of confidentiality, Code of Professional Responsibility DR 4–10–1 would apply. *See Smith County Educ. Ass'n v. Anderson*, 676 S.W.2d 328, 332–35 (Tenn.1984) (holding that the ethical duty is better grounds for exception to open meetings act).

Other jurisdictions have held, however, that lawyer-client privilege is more than just a testimonial exclusion. "The privilege against disclosure is essentially a means for achieving a policy objective of the law. The objective is to enhance the value which society places upon legal representation by assuring the client full disclosure to the attorney unfettered by fear

that others will be informed.... If client and counsel must confer in public view and hearing, both privilege and policy are stripped of value." *The Sacramento Newspaper Guild v. Sacramento County Bd. of Supervisors*, 263 Cal.App.2d 41, 53–54, 69 Cal.Rptr. 480 (1968) (since superseded by statute).

**23.** Some jurisdictions have refused to imply the exception to their open public meetings statutes even for pending litigation. *Neu v. Miami Herald Publishing Co.*, 462 So.2d 821, 824 (Fla.1985) (since superseded by statute); *Laman v. McCord*, 245 Ark. 401, 432 S.W.2d 753, 755–56 (1968) ("The city attorney, with the assistance of the mayor, department heads, and other municipal employees, can certainly prepare a case for trial without discussing his plans in detail with the [public body]. By analogy, the State of Arkansas is continually engaged in litigation, but there is scant occasion for its Attorney Gen-

legal advice or opinion by a public body in its capacity as a public agency." *Minneapolis Star & Tribune Co. v. The Housing & Redevelopment Authority in and for Minneapolis,* 246 N.W.2d 448, 454 (Minn. 1976).

▮▮▮▮ The privilege should not be applied blindly. *Id.* at 453. It is not enough that the public body be involved in litigation. Rather, the rationale for the confidentiality of the specific communication at issue must be one which the confidentiality doctrine seeks to protect: candid discussion of the facts and litigation strategies. *Channel 10,* 215 N.W.2d at 825–26. *See also City of San Antonio v. Aguilar,* 670 S.W.2d 681, 686 (Tex.App.1984) (holding that a conference on decision to appeal deserves confidentiality); *Hui Malama Aina O Ko'olau v. Pacarro,* 4 Haw.App. 304, 666 P.2d 177, 183–84 (1983) (holding that a settlement conference deserves confidentiality). The principles of confidentiality in the lawyer-public body relationship should not prevail over the principles of open meetings unless there is some recognized purpose in keeping the meeting confidential. *Channel 10,* 215 N.W.2d at 825.

▮▮▮▮ The privilege thus should be applied only when the revelation of the communication will injure the public interest or there is some other recognized purpose in keeping the communication confidential. Such requirements are especially appropriate where, as here, the public body's counsel is also appearing before the body as an advocate. Public revelation of public counsel's interpretation of "what has happened in the year between the last session and today as to Court findings" would not be injurious to the public interest. It might be informative and desirable.

However, we find this case to be a very specific exception to the Open Meetings Act. The Board members had been threatened with personal liability. The liability was with reference to ongoing litigation. By calling the executive session, the Board was merely following through on Judge Savell's admonition to the Borough's counsel. The Board was entitled to legal advice as to how it and its members could avoid legal liability, although not general legal advice. The Borough did not violate the Open Meetings Act.

### 2. TAXING AGENCY METHODOLOGY

#### a. Standard of Review.

▮▮▮▮ The recognized standard of review of administrative decisions involving questions of law or fact requiring agency expertise is the reasonable basis test. *North Star Alaska Housing Corp. v. Fairbanks North Star Borough, Board of Equalization,* 778 P.2d 1140, 1144 n. 7 (Alaska 1989). This court has used this deferential standard before for reviews of tax assessments: "Taxing authorities are to be accorded broad discretion in deciding among recognized valuation methods." *Id.* at 1143–44. If a reasonable basis for the taxing agency's method exists, the taxpayer must show fraud or the "clear adoption of a fundamentally wrong principle of valuation." *Hoblit v. Greater Anchorage Area Borough,* 473 P.2d 630, 632 (Alaska 1970) (quoting *Twentieth Century Investment Co. v. City of Juneau,* 359 P.2d 783, 788 (Alaska 1961)).[24]

#### b. The Parties' Relative Burdens of Proof.

Alaska law provides that the taxpayer bears the burden of proof before a Board

---

eral or its other legal counsel to confer in secret with the members of the General Assembly.").

At least one jurisdiction has applied the exception to potential litigation. *Hui Malama Aina O Ko'olau v. Pacarro,* 4 Haw.App. 304, 666 P.2d 177, 183–89 (1983).

**24.** Technically, Cool Homes has erroneously couched its points on appeal in terms of superior court error. This court will independently

review the merits of an administrative determination. No deference is given to the superior court's decision when that court acts as an intermediate court of appeal. *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.,* 746 P.2d 896, 903 (Alaska 1987). This court is reviewing, and must find error in, the Board of Equalization's determinations, not the superior court's.

of Equalization. "The only grounds for adjustment of the assessment are proof of unequal, excessive, improper, or under valuation based on the facts that are stated in a valid, written appeal or proven at the appeal hearing." AS 29.45.210(b). The Borough Code contains similar language. FNSB 3.24.012(C)(2). The Borough contends throughout its brief that Cool Homes lost its appeal because it failed to offer adequate evidence, including suggestions as to what the proper valuation method should be. Cool Homes counters that it should prevail because the Borough must justify its valuation method and demonstrate that it is supported by substantial evidence.

■■■■■ taxpayer contesting an assessment need only prove that the valuation is improper. The taxpayer does not have to offer the correct amount, range or method of valuation, as the Borough repeatedly insisted. *See Alascom, Inc. v. North Slope Borough Bd. of Equalization,* 659 P.2d 1175, 1180 (Alaska 1983) (noting that the Borough has responsibility of making valid assessment); *North Star Alaska Housing,* 778 P.2d at 1146 (stating that the proper remedy is to remand to the Board for redetermination). The burden then shifts to the taxing authority to introduce credible evidence which substantiates its assessment. *See Hoblit,* 473 P.2d at 632.[25]

■■ However, AS 29.45.210(b) still requires that the taxpayer prove *facts* at the hearing. Moreover, the Borough Code states that the "Appellant's presentation must contain evidence which, if not contradicted, would prove an unequal, excessive, improper or under valuation." FNSB 3.24.-012(C)(2). It is not enough merely to argue that the valuation was inadequate or demand a justification from the taxing authority.

c. Adjustment for Lease Restrictions.

■■ The Borough employed a valuation method whereby the land subject to Cool Homes' leasehold was valued as a fee simple interest and then adjusted to reflect the leasehold's restrictions and the reversionary interest of the United States. The Borough used a 10 percent adjustment factor to reflect the restrictions. This method and the 10 percent factor have been approved by this court before for a similar lease and housing project on United States military lands. *North Star Alaska Housing,* 778 P.2d at 1145–46.

Cool Homes contends that 10 percent does not adequately reflect the extensive restrictions on its leasehold.[26] It argues that the Borough has never put forward evidence to demonstrate that a 10 percent factor accurately reflects the differences

25. A superior court opinion included in the record by FNSB spoke of this burden: "At trial or upon review, however, the taxing authority has the burden to produce a record which 'contains credible evidence substantiating [its] assessment.'" *Alaska Int'l Air, Inc. v. Fairbanks North Star Borough,* Case No. 75–505/527 (Alaska Super., August 29, 1978) (quoting *Hoblit,* 473 P.2d at 632).

Cool Homes contends that its burden allocation is consistent with the reasonable basis test. However, Cool Homes is confusing burden of proof with standard of review. The former refers to the parties' obligations at the hearing before the Board and is governed by statute in this case. The latter refers to the role this court plays on appeal.

26. The superior court refused to consider Cool Homes' challenge to the 10 percent "discount" rate on the grounds that Cool Homes had not challenged that rate in the administrative pro-

ceeding. Cool Homes maintains that it had argued this issue in appeals hearings dating back to 1986 and incorporated the record of the earlier appeals into the 1989 record. Cool Homes implies that the superior court's refusal was error sufficient to reverse the affirmance. However, as discussed above, we are reviewing the Board's determination, not that of the superior court.

In addition, the Borough points out that both Cool Homes and the superior court confused two different 10 percent calculations. One is the 10 percent deducted from the fee simple value to reflect restrictions. The Borough argues that this issue is not properly before this court, but gives no reasons in support. The other is the 10 percent discount rate used to adjust the assessment to present values. This rate has not been contested below or in Cool Homes' briefs and is not properly before us.

between the value of Cool Homes' lease-hold interest and the hypothetical fee simple value. Thus, the Board had no reasonable basis upon which to affirm the assessment.

 Moreover, Cool Homes contends that it has met its burden of proving that the 10 percent adjustment is unsound. The thrust of its argument is that because of recognized differences [27] between Cool Homes' interest and the interest in *North Star Alaska Housing* and other projects in Fairbanks, the same 10 percent factor should not have been used.

The evidence before the Board that the lease restrictions were improperly accounted for consisted of the affidavit of Kenneth D. Lougee, counsel for Ben Lomond, Inc., which was filed with the Board in 1986; the deposition and testimony of Mr. Norm Thompson, president of Cool Homes, presented in the 1987 hearing; and Mr. Lougee's argument before the Board in 1987. Mr. Lougee's affidavit merely stated that both the Cool Homes property and the Railroad Industrial Area property in Fairbanks were assessed the same 10 percent deduction, even though the Railroad property is not located on a federal enclave. Thompson's deposition detailed the lease restrictions in Cool Homes' contract with the Air Force. Mr. Lougee's testimony noted that Cool Homes' interest was distinguishable from that of the North Star project because the land lease outlasted the project lease.

The evidence produced by Cool Homes is insufficient to satisfy its burden, thereby triggering the Borough's burden to defend the 10 percent deduction. All Cool Homes has said is that its leasehold had many restrictions and that it was different than other properties for which the 10 percent adjustment was also used. It offered minimal evidence that the 10 percent was "unequal, excessive or improper" and did not reflect these restrictions. The Board thus had a reasonable basis for affirming the assessment with respect to the adjustment for lease restrictions.

### d. Salvage Value.

 The Board of Equalization upheld and assessed improvements valuations for Cool Homes' interest in the sum of $24,527,500 for 1987, $22,633,512 for 1988, and $21,690,449 for 1989. These valuations were arrived at by a replacement cost method. Under this method the current replacement cost of the improvements was calculated using two alternative cost formulas. The assessor used the lower result. This was then reduced by a factor of 15 percent to account for presumed savings because of the size of the Cool Homes' project. The resulting figure was in turn depreciated at the rate of four percent per year over 20 years with 1987 used as the base year. Thus, the Borough assumed that Cool Homes' interest in the improvements would lose 80 percent of its value over the term of the lease. The remaining 20 percent was attributed to salvage value,

---

**27.** The Borough's deputy assessor admitted at least that Cool Homes' interest was the only 20 year lease for which the Borough had assessed taxes. He also stated that Cool Homes' interest was considered similar to the North Star project. "[It]'s not unlike the assessment of the North Star. We felt that we treated this one as fair as that one."

The Borough contends that the issue of "recognized differences" is not properly before us because it was not listed in Cool Homes' Statement of Points on Appeal. Generally, an issue not included in the Statement of Points on Appeal will not be considered on appeal. *Oceanview Homeowners Ass'n v. Quadrant Constr. and Engineering*, 680 P.2d 793, 797 (Alaska 1984).

Although the statement must set forth the points in more than general terms, an elaboration of legal theories relied upon is not required. *Lewis v. Anchorage Asphalt Paving Co.*, 535 P.2d 1188, 1195 (Alaska 1975). The key is that the statement adequately notify the opposing party and the court of the possible sources of error. *Myers v. Sill*, 497 P.2d 920, 923 (Alaska 1972). Thus, we will consider an issue omitted from the points on appeal if the issue was raised at the trial level and the opposing counsel was apprised of it. *Oceanview Homeowners*, 680 P.2d at 797. Here, "recognized differences" is an obvious subcategory of the stated point on appeal concerning the 10 percent rate. Thus, it is properly before this court.

that is, the value from the improvements which Cool Homes could recover at the end of the lease.

Borough assessment personnel cross-checked the result reached by the replacement value approach by referring to market indicators and a capitalization of income approach. Testimony indicated that the best market indicator was the fact that Aetna Life Insurance Company had loaned Cool Homes' predecessor $30,000,000 as permanent financing for the project. Borough assessment personnel testified that if a market approach had been used "we would have come in with somewhere around $30,000,000" based on this transaction. Based on the income stream calculation, Borough personnel testified that a valuation of roughly $28,000,000 would have been appropriate in the first year.[28] Deputy Assessor McManus testified that the replacement cost method was employed rather than direct market comparisons or income capitalization because replacement cost is uniformly used throughout the Borough for all improved property.

Focusing on the replacement cost method employed by the Borough, Cool Homes contends that the use of any salvage value is inappropriate. It relies on the following finding made by Superior Court Judge James R. Blair in a prior appeal:

After the twenty-year term is up, the lease is renewable at the government's option. If the government opts not to renew the lease, Cool Homes' sole recourse is to remove the buildings within thirty days and restore the land to its prior condition. It is undisputed that the buildings cannot be so removed.

The Borough defends the 20 percent salvage value by referring to testimony by Deputy Assessor McManus which suggests that the buildings can be moved [29] and that in any event even if they had to be dismantled on site, a 20 percent salvage value figure would be appropriate. McManus stated:

We're saying that if entrepreneur or entrepreneurs or just people that wanted to buy things, if they'd be willing to pay 20¢ on the dollar, they'd dismantle and cart them off, but more appropriately that they relocate them as units in place. Certainly there's a cost and Ray Mark indicated the cost, it averaged around $8,500 to move the Hutchinson Career four-bedroom out to North Pole. And he said that price can vary depending upon how many electrical lines are in the way; how many obstacles; it's a fairly clear shot from Eielson to, perhaps, the North Pole area; probably more clear than from out there off of University Avenue. But, basically, it appeared from the marketplace that individuals were willing to pay 50¢ on the dollar for new ones. We also took a look at homes that were in the salvage value condition, and either need to be completely refurbished, or actually relocated elsewhere and—or, in some cases, dismantled and salvaged, the components of them, and any way that we looked at them we still came up with about a 20 percent value. So, we thought that the 20 percent was fair over a 20-year period.[30]

At another point McManus further explained the salvage figure:

And at the end of that 20 years one of the options available is that Cool Homes

**28.** Cool Homes called an expert on the subject of valuation who, using an income stream method of valuation, arrived at a figure of $22,711,507 assuming 18 years left on the lease. Since 18 years would be left on the lease as of 1989, this figure should be compared with the Borough's 1989 assessment.

**29.** The project consists of 51 four-plexes, 48 duplexes, and one office/shop building. All buildings are 2 × 6 wood frame construction.

**30.** McManus made clear that the 20 percent did not include any valuation for the possibility that the federal government would renew the lease. He stated: "No, those assumptions would not be valid; I mean, they just don't have that crystal ball. In the worst case scenario is that they'd be asked to remove those structures, and that's why we felt the 20 percent salvage was appropriate."

will remove improvements from the Eielson Air Force Base land and that's where the 20 percent salvage comes in. To determine that 20 percent we took a look at Hutchinson Career Center who has been building, for several years now, homes that they do build, but they're sitting on—they're sitting to be relocated. And those prices have ranged from $25,001 all the way up to $52,000 depending on the magnitude of the size, I should say, of the structure. They're the same structures, once placed on a tract of land, full site improvements, on foundation, with water and sewer, generating a value of—The lowest was $51,000, the highest was $96,000. And we rounded this to conclude that it was .50¢ on the dollar that individuals were willing to pay for a structure that had to be relocated. We checked with Ray Mark with Mark Acres to find out the cost of relocating these structures and in our mind was that people could safely invest 50¢ on the dollar. But, we're looking at a rather large project here so we had to deduct the 20 percent from there and that's where we come up with the 40¢ on the dollar for their improvements recognizing that these would be 20 years old on a four [sic forty] year economic life is the same as saying that we'd reduce it from 40¢ to 20¢ then, or half used up. And the 20¢ on the dollar then we felt was a fair estimate of salvage value and that equates to 20 percent.

Although there was evidence presented by Cool Homes that the structures could not be relocated, the testimony of McManus, especially as it relates to the buildings' value in a dismantled state, is sufficient, in our view, to substantiate the assessment.

As a part of its argument that the Borough erred in using a 20 percent salvage value, Cool Homes states: "The use of a salvage value in connection with 'accelerated depreciation,' is also erroneous." Cool Homes' argument seems to be that depreciating the improvements over a 20–year life fails to consider the residual value to the government of the improvements since the useful life of the buildings is at least 40 years.

This argument lacks merit. The Borough depreciated the improvement over 20 years rather than 40 because in an earlier appeal of this case to the superior court the superior court accepted Cool Homes' predecessor's argument that assessing its interest based on a 40–year useful life did not take into account the fact that there was only a 20–year lease. *See Ben Lomond, Inc. v. Board of Equalization,* 760 P.2d 508, 510 (Alaska 1988). To contend that the 20–year depreciation schedule does not account for the government's reversionary interest is clearly wrong. Because of the accelerated depreciation, Cool Homes will be taxed in future years on a value which is progressively less than the replacement cost of the project taken as a whole. The difference between the amount on which Cool Homes is taxed and the replacement cost, less depreciation keyed to the true useful life of the buildings, is the reversionary interest to the government.

3. CROSS–APPEAL: SUPPLEMENTATION OF THE RECORD BY THE SUPERIOR COURT

In May, 1989 the Board of Equalization affirmed the Borough's tax assessment of Cool Homes' real property interests. In June, Cool Homes appealed to the superior court. During the course of the appeal, Cool Homes noticed that a document entitled "Assignment of Rents and Leases" was not part of the record. On May 16, 1990, it filed a Motion to Supplement Record. The motion was granted by order of the superior court in October. The Borough appeals, contending that the motion to supplement was improperly granted.

A board of equalization is authorized in the Municipal Government title of the Alaska Statutes. AS 29.45.200. A determination of a board of equalization may be

appealed to the superior court "as provided by the rules of court applicable to appeals from decisions of administrative agencies." AS 29.45.210(d). The superior court hears the appeals "on the record established at the hearing before the board of equalization." AS 29.45.210(d).

■ The limitation on the record was added to the provision in 1985. The section which was replaced, former AS 29.53.140(f), allowed for trial *de novo* on appeal to the superior court. The legislature thus expressly chose to limit the scope of review of the board's determinations. *See Winegardner v. Greater Anchorage Area Borough*, 534 P.2d 541, 547 (Alaska 1975) (noting that a trial *de novo* allowed by former statute on issue of whether assessment was proper "represents a decision by the legislature that in tax assessments, the borough assembly shall not be the only judge in its own case"). This is in contrast to the statute governing the appeal to the superior court of some state administrative agencies. AS 44.62.570(d).[31]

However, supplementation of the record has not prejudiced the Borough. Even with the supplemented record, the superior court ruled in the Borough's favor. The supplemented document does not impact this court's decision because it has not been argued in Cool Homes' briefs before this court. Thus, the granting of the motion was harmless error which this court will disregard. *See Boyles v. Smith*, 759 P.2d 518, 521 (Alaska 1988).

### III. *CONCLUSION*

The court's grant of summary judgment in S–3995, the Borough's action to foreclose Cool Homes' interest in its buildings on Eielson Air Force Base, is REVERSED and REMANDED for further proceedings consistent with this opinion. The court's grant of summary judgment in S–4337 for personal judgment to recover property tax assessed against Cool Homes' leasehold interest is AFFIRMED.

Concerning Nos. S–4338/4353 the Board did not violate the Open Meetings Act by conferring in private with its attorney before hearing Cool Homes' case. With respect to the validity of the tax assessment of Cool Homes' property, the Board did have a reasonable basis for affirming the Borough's assessment which included a salvage value and accelerated depreciation. The Board had a reasonable basis to affirm the use of the 10 percent factor to reflect lease restrictions.

The superior court's grant of summary judgment is REVERSED and REMANDED for further proceedings consistent with this opinion.

COMPTON, Justice, dissenting in part.

I dissent from the holding in section C, subsection (2)(d), regarding salvage value. In my view neither the Borough nor this court has satisfactorily answered Cool Homes' arguments.

The Borough depreciated Cool Homes' interest in the improvements using a 4 percent depreciation rate over a twenty year period. Thus, the Borough assumed that Cool Homes' interest would lose 80 percent of its value over the terms of its lease. The remaining 20 percent was attributed to salvage value, that is, the value

---

**31.** Under those provisions the superior court is still required to find "that there is relevant evidence which, in the exercise of reasonable diligence, could not have been produced or which was improperly excluded at the hearing...." AS 44.62.570(b).

Cool Homes contends that AS 44.62.570(d) also applies to a board of equalization. However, the agencies covered by that statute are listed in AS 44.62.330, the opening section of the Administrative Procedure Act. The act provides that its rules may also be applicable to other agencies "only as to those functions to which [the act is] made applicable by the statutes relating to that agency." AS 44.62.330(b). The statute allowing for appeals of board of equalization determinations does not reference the Administrative Procedure Act. Rather, the "rules of court" to which it refers are the appellate rules dealing with the superior court as an appellate court. *See* Alaska R.App.P. 601–12.

of the improvements which Cool Homes could recover at the end of the lease.

Cool Homes contends that because of the nature of its contract with the Air Force, any salvage value is inappropriate. In a prior appeal regarding this property, Superior Court Judge James R. Blair made the following finding:

> After the twenty-year term is up, the lease is renewable at the government's option. If the government opts not to renew the lease, Cool Homes' sole recourse is to remove the buildings within thirty days and restore the land to its prior condition. It is undisputed that the buildings cannot be so removed.[1]

*Cool Homes, Inc. v. Fairbanks North Star Borough*, Case No. 4FA–87–1093 Civil (Alaska Super., Dec. 19, 1987). This finding has not been contested.

The court affirms the salvage value figure on the basis of the testimony of Deputy Assessor McManus, which it claims "substantiate[s] the assessment." I submit that the testimony begs the question, rather than answering it.

McManus' first quoted testimony, and conclusion, is predicated on a person being willing to pay $.20 on the dollar for a building in salvage value condition. These are the two qualifiers to this conclusion:

> [I]f entrepreneur or entrepreneurs or just people that wanted to buy things, *if* they'd be willing to pay $.20 on the dollar, they'd dismantle and cart them off, but more appropriately that they relocate them as units in place.... We also took a look at homes that were *in the salvage value condition*, and either need to be completely refurbished, or actually relocated elsewhere and—or, in some cases,

dismantled and salvaged, the components of them, and ... we still came up with about a 20 percent value.

(Emphasis added).

This is not evidence that substantiates that the buildings will be in salvageable condition when the land lease expires.

McManus' next quoted testimony is similarly flawed:

> To determine that 20 percent we took a look at Hutchinson Career Center who' has been building, for several years now, homes that they do build, but they're sitting on—they're sitting to be relocated.

These are homes that are built to be relocated in the first place.

The Borough looked to Hutchinson Career Center, which constructs buildings to be relocated, in determining the twenty percent salvage value. The Borough concluded that people were willing to pay 50 cents on the dollar for these relocated buildings. The Borough obtained an estimate from Mark Acres confirming that "the cost of relocating these structures and in our mind was that people could safely invest .50 cents on the dollar." The Borough then discounted the fifty percent to forty percent because of the size of the Cool Homes' project. The Borough further reduced that in half to twenty percent to account for the fact that the buildings would be twenty years old (half of the forty year economic life estimate). Again, this is not evidence that the buildings will be capable of being relocated, or in an otherwise salvageable condition, when the land lease expires.

There is no evidence that moving these buildings will be possible. There is no evidence to take into account any cost of removing buildings which were not con-

---

1. The finding that the buildings could not be removed in 30 days especially in a salvageable condition is based on the affidavit and testimony of John R. Jones in the 1987 appeal to the Board of Equalization. Jones testified:

 It would be like taking a bucket of sticks and taking the bottom one out; they would crumble.... Even if they could be moved, there is

so much utilidor and concrete work in the project, to bring equipment in to even [do] demolition would be really a very impossible thing. We'd spend more time taking the equipment out of the ditches and the holes and some 12–foot deep utilidors for the size of equipment....

structed for relocation. On this record, the improvements will have no value to Cool Homes when the term of the land lease expires.

In the 1989 appeal before the Board, Cool Homes also elicited testimony from Deputy Assessor McManus that the Borough did not consider Judge Blair's findings that the improvements could not be removed when calculating the salvage value. And although it is possible that the Air Force could change its mind and renew the lease or purchase the buildings, the Borough admitted that it would be improper to base assessments on mere possibilities.[2]

Cool Homes met its burden of proving that the salvage value, if any exists at all, was assessed erroneously. The Board did not have a reasonable basis to affirm the assessment of the salvage value.[3] I would remand this issue to the Board to determine what the rubble would be worth.

Cool Homes also contends that the use of the accelerated depreciation method was improper. The thrust of Cool Homes' argument is that the accelerated depreciation method does not adequately account for the reversionary interest the government will have in the improvements after the land lease expires. Again, Cool Homes complains that the Borough has not put forward any evidence to justify this method without itself producing facts which cast doubt on it. Its argument keys on the contention that the assessed value bears no relation to the project's cash flow.

The only evidence before the Board that the Borough was excluding the government's interest in the improvements from the assessment was from McManus: "We feel we're doing that, yes, in that accelerated depreciation." The Borough's "feeling" that the reversionary interest is excluded is not evidence.

It is possible that over the life of the twenty year lease the reversionary interest will be excluded, but there was no evidence presented that substantiates how this method works. Evidence was presented

---

**2.** Before the 1989 Board, the deputy assessor testified as follows:

> Q: And just for the record, in using the number you're not in any way making any assumptions about what the government might do as far as renewing the lease, extending the lease, issuing a new lease?
>
> A: No, those assumptions would not be valid; I mean they just don't have that crystal ball. In the worst case scenario is that they'd be asked to remove those structures, and that's why we felt the 20 percent salvage was appropriate.

The superior court justified the salvage value because "[a]lthough Cool Homes may not be able to remove the buildings at the end of the lease, it will benefit from the possible sale of the structures to the government." *Cool Homes, Inc. and Ben Lomond, Inc. v. Fairbanks North Star Borough, Board of Equalization,* Case No. 4FA–89–1078 (Alaska Super., Nov. 19, 1990). The Borough admitted, however, that such a sale was not a consideration. Rather, the assessor considered that the corporation had to remove and then refurbish, relocate or otherwise salvage the property. However, Judge Blair found that none of these was a realistic possibility.

The Borough's contradictory contention in its brief that the assessment was performed assuming "the worst case scenario from the owner's viewpoint—the destruction of the houses and the end of the lease" is not supported by the record. Instead, the deputy assessor testified

that the worst case scenario was the "removal" of the structures.

**3.** Cool Homes and amicus curiae Aetna Life Insurance Company also urge the court to direct the Board on remand to further exclude the value of the land improvements beyond the land lease term from the tax. "To the extent that the estimated useful life of any of these items extends beyond the term of the lease, the value attributable to such period must be excluded from the tax since it represents the Government's ownership interest." *Ben Lomond,* 760 P.2d at 512 (quoting *Offutt Housing Co. v. County of Sarpy,* 351 U.S. 253, 262 n. 1, 76 S.Ct. 814, 820 n. 1, 100 L.Ed. 1151 (1956)). *See also Duwamish Warehouse Co. v. Hoppe,* 102 Wash.2d 249, 684 P.2d 703, 707 (1984) (reversing a judgment which ignored the reversion of a building to the public long before its useful life expired).

The contract does caution that the government may take possession of the improvements without payment at the end of the land lease. However that is merely one possibility which may happen when the land lease expires. Taking of the housing by the government is still not any more likely than any of the other possibilities like renewal of the lease. Cool Homes urges elsewhere that such possibilities should not be considered. Thus it seems just as improper to deduct the remaining useful life from the tax (a negative salvage value) as it would be to calculate a salvage value.

that in the first year Cool Homes would be taxed on 100% of the value of the improvements, with nothing deducted for the government's reversionary interest. In the second year 4%, would be deducted, and the next year 8%. No evidence was presented that justifies this method of valuing the reversionary interest.

Cool Homes does not dispute that the Borough may use a reversionary method of tax assessment. "This method begins by valuing property at its fee simple value. This value is then reduced, or discounted, by a factor representing the restrictions on the property. The value is further reduced to remove any value pertaining to the reversionary interest of the government in the land." Cool Homes claims a straight-line depreciation to reduce the initial value down to salvage value at the end of the lease period does not exclude the value of the reversionary interest. Cool Homes presented evidence that a straight line depreciation over the life of the lease to salvage value is a "fundamentally wrong" way to account for the governments reversionary interest. The Borough presented no evidence that its method was reasonable. Cool Homes' experts testified that the income stream approach was the more sound method. I conclude that Cool Homes' argument is persuasive.