MAASSEN, Justice.
I. INTRODUCTION
The superior court affirmed a municipality's tax valuation of a landowner's property. The landowner argues on appeal that the municipality's valuation review board abused its discretion by excluding certain evidence of value on timeliness grounds; we find no abuse of discretion. The landowner also argues that the board applied fundamentally wrong principles of valuation by failing to consider, as definitive evidence of value, either his purchase price for the property or the price for which he sold a neighboring lot. But the assessor explained at the hearing why he considered certain evidence of value more persuasive and more consistent with the municipality's usual methods of appraisal, and it was well within the board's broad discretion to accept the assessor's explanation.
*727 We therefore affirm the superior court's decision upholding the board's valuation of the property.
II. FACTS AND PROCEEDINGS
A. Facts
In September 2016 Leonard Kelley bought Thunderbird Falls Lot 5 from the Mancel O. Pederson Estate for $ 160,000. Located in a subdivision within the Municipality of Anchorage, Lot 5 is 93,006 square feet and has a residence on it. The Municipality's assessor valued Lot 5 at $ 318,900 using a market adjusted cost approach, which he described as "includ[ing] land value as if vacant plus depreciated replacement cost of the improvements ... calibrated to specific market segments based on a large sampling of sales data."
In February 2017 Kelley appealed the valuation to the Municipality of Anchorage Board of Equalization, asking for time to gather additional evidence. With his appeal he submitted the settlement statement from his purchase of Lot 5, along with a letter describing various "building deficiencies" in the residence: problems with the septic system, rot in the garage and deck, a leaky roof, and windows that needed replacing, as well as a general need for improvements and repairs. In response, the Municipality's assessor asked Kelley to submit "[c]ontractors['] itemized estimates of the cost to repair damage, as indicated in your [letter]," by April 1, but Kelley did not do so.
The assessor nonetheless made a number of adjustments to his valuation of the property following a March site inspection, including correcting the square footage, removing the garage and carport from the assessed property, and changing the condition "from average to poor plus for deferred maintenance." Kelley then submitted additional evidence: a Multiple Listing Service (MLS) listing for Lot 5 showing an asking price of $ 298,000; his purchase agreement; photos of the property; and a 2016 article describing economic trends in Alaska. Kelley later submitted the name of the seller's agent for his purchase, along with information about his August 2016 sale of a neighboring lot to a developer, Troy Davis Homes, for $ 77,000.[1]
The assessor emailed the seller's agent seeking an explanation for Lot 5's purchase price; he noted that the property had been listed for months, had a sale pending at $ 225,000, then, when that sale "fell through," was sold to Kelley for "his cash offer of $ 160,000" just a few weeks later. The seller's agent later responded to Kelley, who forwarded her response to the assessor. She explained that the property "was marketed heavily" but failed to sell because of "the age and deferred maintenance of the property," making financing "a challenge," and ultimately "the owner decided to accept an offer lower than list price, taking into consideration the cost of repairs the buyer would need to address." In the meantime, on March 29, the Municipality sent Kelley a new valuation of $ 259,800, based on the assessor's revised recommendation following his site inspection. Kelley did not accept this valuation either, however, and his appeal was forwarded to the Board.
B. Proceedings
The Board held an appeal hearing on April 20 and upheld the assessor's recommended value of $ 259,800. Kelley asked for reconsideration, alleging two procedural errors: (1) the Board's refusal to admit "documentary evidence" of the value of two other properties in the subdivision and (2) the Board's refusal to allow Kelley to directly question the assessor. The Board granted reconsideration and scheduled another hearing for May 10.
At the start of the second hearing, the Board chair announced that new procedures would allow "both parties [to] have an opportunity to ask each other questions before we close the testimony." The chair also ruled that absent the Municipality's agreement, the Board would not accept Kelley's offered documentary evidence related to other properties because he had failed to comply with the deadline for submitting that information to *728 the assessor.[2] The assessor, while maintaining the Municipality's objection to that evidence, agreed that Kelley could "speak to it"; the chair allowed this, reasoning that if the evidence was really from municipal records, as Kelley claimed, "it should be very easy for anyone to find."
Kelley testified that Lot 5 had been "fairly marketed, openly marketed" by a realtor and listed on MLS for over 15 months and that the seller "was under no duress" when he bought it. He testified that neighborhood lot values ranged from $ 77,000 to $ 90,000, referring to the documentary evidence to which the Municipality had objected. He argued that the comparable sales figures used by the assessor were higher because they were "pre-recessionary." He said that his own valuation of $ 160,000-the price he paid for Lot 5-was based on the poor condition of the building, necessitating over $ 45,000 in repair costs.
The assessor then testified about his use of the "market adjusted cost approach" in valuing Kelley's property. He explained that "[p]art of the definition of market value is [whether the property was] exposed to an open market, was [the sale] between knowledgeable buyers, between reasonably informed buyers or reasonably informed sellers." He testified that the open market was usually accessed through the MLS, and that if owners sold their property without an MLS listing, the Municipality's "operating procedure" required that he "not consider that [as] exposure to the open market." He believed Kelley's purchase of Lot 5 to be a "discounted cash sale" which did not represent fair market value; factors he considered were that previous pending sales had fallen through, Kelley offered cash ("an atypical financing transaction type"), and Kelley accepted the property "as is" without an inspection. He pointed to Lot 5's listing history, in which the price dropped from $ 225,000 to $ 160,000 in ten days, as evidence of some sort of duress on the seller. He also testified that purchases from estates "generally are not considered at-market sales, especially when they have condition issues," because the heirs "may have just [given] up on it and wanted to unload the property...." He conceded that "[b]ecause of the condition of the subject [property], it is difficult to find comparable sales that support the revised value," but he stood by that value as equitable and consistent with the Municipality's usual methods of assessment.
The Board again affirmed the Municipality's valuation of $ 259,800. Kelley appealed to the superior court, which affirmed the Board's decision. Kelley now appeals to us.
III. STANDARD OF REVIEW
We "independently review the merits of an administrative board's decisions."[3] We will affirm an administrative decision involving questions of fact or law requiring agency expertise if the decision has a reasonable basis.[4] We have consistently held that "[t]axing authorities are to be accorded broad discretion in deciding among recognized valuation methods."[5] The taxing authority is "not bound by any particular formula, rule or method, either by statute or otherwise. Its choice of one recognized method of valuation over another [is] simply the exercise of a discretion committed to it by law."[6] What concerns us is "nothing less than fraud or the *729 clear adoption of a fundamentally wrong principle of valuation."[7] If the appraiser has not "transgressed the bounds of honest judgment," the taxing authority's selected valuation should be upheld.[8]
"An agency adjudicator's decision to exclude evidence is reviewed for abuse of discretion."[9]
IV. DISCUSSION
Kelley raises three arguments on appeal, one procedural and two substantive. He first challenges the Board's exclusion of certain evidence of value, but we conclude that the Board's action was consistent with the governing provisions of the Anchorage Municipal Code and not an abuse of discretion. Kelley's substantive arguments focus on the Board's failure to accept as determinative of value two sale prices: one the amount Kelley paid for the lot at issue and the other the amount Kelley received a month earlier for his sale of the neighboring lot. But we conclude that the Board acted well within its broad discretion in considering the evidence of value and reached a decision that had a reasonable basis in the evidence.
A. The Board Did Not Err By Refusing To Admit Kelley's Offered Documentary Evidence Of Other Lots' Values.
The documentary evidence Kelley offered at the two hearings, and which the Board refused to admit on timeliness grounds, consisted of public inquiry statements showing the assessed values of two neighboring lots. The Anchorage Municipal Code (AMC) provides that "[d]ocuments to be submitted as evidence by the appellant must be filed with the assessor no later than 15 days from the close of the appeal period,"[10] which is "30 days after a tax assessment is mailed to the property owner."[11] "The appellant is precluded from introducing at the Board hearing any evidence not submitted by the deadline."[12]
Kelley argues that he made "good faith attempts to comply with the [Municipality's] deadlines," but he does not elaborate on what those attempts were. The date of the original assessment does not appear in the record, but Kelley responded to it on February 13, 2017, requesting an extension of the evidence-submission deadline "until assessor review." The assessor conducted his site inspection on March 8 and sent Kelley a reduced valuation on March 29; in the meantime Kelley had sent the assessor a variety of additional evidence, not including the public inquiry statements. He first attempted to introduce those statements at the April 20 appeal hearing, over 60 days after he had first requested an extension of the 15-day time limit for the submission of evidence.
While maintaining the documents' exclusion at the second appeal hearing, on May 10, the Board still allowed Kelley to testify about the property values shown in the excluded statements. Kelley was also allowed to question the assessor about the differences between those values and the one assigned to Lot 5; the assessor theorized that the different values could reflect differences in topography or wells and septic systems. In Brandner v. Municipality of Anchorage , the record suggested that the property owner "did not make a good faith attempt to comply with the Municipality's deadline" for the submission of repair estimates, and the Board nonetheless allowed the owner to testify about them; we concluded that the Board did not abuse its discretion by excluding the documentary evidence.[13] Because the record does not reveal a good faith attempt at compliance, and because the Board in any event allowed Kelley to introduce the substance of the omitted evidence through testimony, we reach the same conclusion here.[14]
*730 B. The Board Was Not Required To Find That Kelley's August 2016 Sale Of A Different Lot For $ 77,000 Was Definitive Evidence Of Value.
Kelley contends that the Board erred "in refusing to consider" his sale of a different lot in the same subdivision a month earlier to a developer for $ 77,000 "as a fair market value transaction." But the Board heard the assessor's testimony about that sale in response to Kelley's questions; we cannot conclude that the Board refused to consider the evidence, only that the Board, after considering it, failed to find the evidence definitive.
Rejecting the sale as definitive proof of Lot 5's value has support in the assessor's testimony. He testified that the Municipality defined market value based on how the property was "exposed to the open market"; when property is not listed on MLS, the Municipality considers the purchase price as unreliable evidence of market value and will not use it for that purpose. Kelley counters that there are "many ways" for an owner to expose a property to the open market, such as posting a "For Sale" sign, and that the Municipality's reliance on the MLS exclusively for determining exposure to the open market is a "fundamentally wrong principle of valuation."[15] In support of this argument he cites CH Kelly Trust v. Municipality of Anchorage, Board of Equalization ,[16] though without a clear explanation of why he considers the case supportive.
We held in CH Kelly Trust that the Municipality's appraisals of four vacant lots used "a fundamentally wrong principle of valuation" because of the appraiser's "total failure even to consider" the prices the owners paid at auction for the lots the year before.[17] We also observed, however, that "[t]horough analysis of the subject sales might well indicate that the auction prices paid did not represent true market value"; it was the failure to consider them at all-for purposes of deciding whether they were relevant-that justified reversal.[18]
In this case, the assessor testified that he considered Kelley's sale of the lot to the developer but concluded that the price did not reflect true market value because, absent an MLS listing, there was no assurance that the lot had actually been exposed to the open market. The assessor testified that a property owner "ha[s] the option" to list the property on MLS; while the listing may carry a cost, it has the benefit of assuring exposure to the open market for tax valuation purposes. Kelley's conclusory discussion of this issue does not persuade us that the Municipality's reliance on the MLS to demonstrate exposure to the market made its valuation methodology "fundamentally wrong."
C. The Board Was Not Required To Find That Kelley's Payment Of $ 160,000 For Lot 5 Was Definitive Evidence Of Its Value.
Kelley also argues that the Board "erred when it declined to consider the cash sale price of $ 160,000" as conclusive evidence of Lot 5's fair market value. He argues that cash sales are "the accepted definition of the concept of market value," and he cites AS 29.45.110(a)'s definition of "full and true value" for purposes of municipal taxation: "the estimated price that the property would bring in an open market and under the then prevailing market conditions in a sale between a willing seller and a willing buyer both conversant with the property and with prevailing general price levels." Kelley contends that the "sales comparison approach is the most reliable method" of estimating full and true value, and he cites an appraisal manual in support of the proposition that the sales comparison approach is usually employed *731 for the "valuation of a single[-]unit residential property."[19]
The Municipality counters that it does employ a comparable sales approach for the land and did so in valuing Lot 5; it simply selected different sales for comparison purposes than those Kelley advocates. The Municipality submitted to the Board a "Land Sales Adjustment Grid" listing three comparable land sales and concluding that "[t]he indicated value range from $ 96,800 to $ 161,000 supports the [Municipality's] land-assessed value of $ 112,900." But the assessor declined to consider the price Kelley paid for Lot 5 in determining its market value, concluding that the sale "was not an arm's length sale, but rather a discounted cash sale."
The assessor explained this further at the May appeal hearing. He testified that Kelley's purchase of Lot 5 from the Pederson Estate was not considered proof of market value because "estate sales generally are not considered at-market sales, especially when they have condition issues"; the heirs may have "just [given] up on it and wanted to unload the property." He also pointed to the MLS listing history, showing the price falling from $ 225,000 to $ 160,000 in just ten days, as evidence of seller duress. The assessor explained the Municipality's standard practice of valuing the improvements by estimating their replacement cost minus depreciation, and he described the various reductions he made in Lot 5's valuation following his site inspection.
Kelley argues that it is "a fundamentally wrong principle of valuation" to categorically exclude from consideration cash sales and sales by estates, again citing CH Kelly Trust . But the assessor did not purport to apply arbitrary rules; rather, he testified that the Municipality generally considered such circumstances as evidence that the price did not reflect market value. He testified that "estate sales generally are not considered at-market sales, especially when they have condition issues ," as here, and he testified that the cash sale in this case was evidence "that it could be under some sort of duress." (Emphasis added.) As noted above, CH Kelly Trust only counsels against arbitrarily ignoring sales information; it does not require that the assessor accept the property owner's proffered sales as definitive evidence of value.[20]
The assessor gave a cogent explanation of his methodology, and the taxing authority had broad discretion in deciding whether to implement it.[21] We are not persuaded that the Municipality applied "a fundamentally wrong principle of valuation" when it declined to accept the price Kelley paid for Lot 5 as definitive evidence of its value. Because the Board's valuation decision had a reasonable basis in the evidence, we see no reason to disturb it.
V. CONCLUSION
We AFFIRM the superior court's decision affirming the May 10, 2017 decision of the Board of Equalization.

The lot Kelley sold to Troy Davis Homes was identified as "Thunderbird Falls #1 lot 5," not to be confused with the Lot 5 at issue here, which was purchased by Kelley a month later.

See AMC 12.05.053(C)(7) (2018) ("Documents to be submitted as evidence by the appellant must be filed with the assessor no later than 15 days from the close of the appeal period unless the appellant and the assessor agree to an extension. If an appellant has refused or failed to provide the assessor or assessor's agent full access to property or records, the appellant shall be precluded from offering evidence on the issue or issues affected by that access and those issues shall be decided in favor of the assessor.").

Lakloey, Inc. v. Univ. of Alaska , 157 P.3d 1041, 1045 (Alaska 2007) (quoting Gunter v. Kathy-O-Estates , 87 P.3d 65, 68 (Alaska 2004) ).

N. Star Alaska Hous. Corp. v. Fairbanks N. Star Borough Bd. of Equalization , 778 P.2d 1140, 1144 n.7 (Alaska 1989).

Cool Homes, Inc. v. Fairbanks N. Star Borough , 860 P.2d 1248, 1262 (Alaska 1993) (quoting N. Star Alaska Hous. Corp. , 778 P.2d at 1143-44 ).

Twentieth Century Inv. Co. v. City of Juneau , 359 P.2d 783, 788 (Alaska 1961) (internal citations omitted).

Id.

Id.

Brandner v. Municipality of Anchorage , 327 P.3d 200, 202 (Alaska 2014).

AMC 12.05.053(C)(7).

Brandner , 327 P.3d at 203.

Id.

Id.

We note that Brandner involved an unrepresented party and the leniency we extend to pro se litigants. See id. Kelley is an attorney representing himself. Our decision of this issue does not require us to distinguish their cases; Kelley's argument fails even if we grant him the lenience we grant to unrepresented litigants.

See Cool Homes, Inc. v. Fairbanks N. Star Borough , 860 P.2d 1248, 1262 (Alaska 1993) ("If a reasonable basis for the taxing agency's method exists, the taxpayer must show fraud or the 'clear adoption of a fundamentally wrong principle of valuation.' " (quoting Hoblit v. Greater Anchorage Area Borough , 473 P.2d 630, 632 (Alaska 1970) )).

909 P.2d 1381 (Alaska 1996).

Id. at 1382.

Id.

See The Appraisal Institute, The Appraisal of Real Estate 45 (14th ed. 2013).

909 P.2d at 1382.

See Twentieth Century Inv. Co. v. City of Juneau , 359 P.2d 783, 788 (Alaska 1961) (holding that taxing authority is "not bound by any particular formula, rule or method, either by statute or otherwise" (internal citations omitted)).